Adam M. Apton
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HARRISON APITZ-GROSSMAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EMBECTA CORP., DEVDATT KURDIKAR, and JACOB P. ELGUICZE, <br><br> Defendants. | Case No. 2:26-cv-07217 <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **CLASS ACTION** <br><br> <u>Demand for Jury Trial</u> |

Plaintiff Harrison Apitz-Grossman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter*

*alia*: (a) review and analysis of relevant filings made by Embecta Corp. ("Embecta" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Embecta's public documents, earnings calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Embecta common stock between November 25, 2025 to May 4, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information pertaining to Embecta's guidance for second quarter and full year 2026. Defendants' statements included, among other things, misleading information touting Embecta's fiscal year 2026; particularly, continuously reaffirming the Company's revenue guidance and strength in the pen needle segment.

2

3.     Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Embecta's fiscal results; pertinently, Embecta knew or recklessly disregarded that the Company's guidance was misleading and unattainable. In fact, Embecta touted the Company's pen needle business as "incredibly resolute" mere weeks prior to missing expectations and cutting 2026 fiscal guidance. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Embecta's securities at artificially inflated prices.

4.     The truth emerged on May 5, 2026, when Embecta published second quarter 2026 fiscal results disclosing that the Company failed to meet its guidance for second quarter 2026 and lowered fiscal year 2026 guidance. In particular, Embecta revealed that revenue declined over 14%, much higher than the guidance of flat to a decline of 2% and that the Company was lowering estimates on US performance, largely in part due to weakness in its pen needle sales.

5.     Investors and analysts reacted immediately to Embecta's revelation. The price of Embecta's common stock declined dramatically. From a closing market price of $9.25 per share on May 4, 2026, Embecta's stock price fell to $3.90 per share on May 5, 2026, a decline of over 57.8% in a single day.

3

## JURISDICTION AND VENUE

6.     Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Embecta's offices are located in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District, including but not limited to the transmission of public statements to the market from Embecta's offices in Parsippany, New Jersey.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.    Plaintiff purchased Embecta common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Embecta is attached hereto.

12.    Embecta, Inc. is a Delaware corporation with a principal executive office located at 300 Kimball Drive, Suite 300, Parsippany, New Jersey 07054 through which the Company frequently communicates with investors. During the Class Period, the Company's common stock traded on the Nasdaq Global Select Market (the "NASDAQ") under the symbol "EMBC."

13.    Defendant Devdatt Kurdikar ("Kurdikar") was, at all relevant times, the President, Chief Executive Officer, and Director, of Embecta.

14.    Defendant Jacob P. Elguicze ("Elguicze") was, at all relevant times, Senior Vice President and Chief Financial Officer, of Embecta.

15.    Defendants Kurdikar and Elguicze are sometimes referred to herein as the "Individual Defendants." Embecta together with the Individual Defendants are referred to herein as the "Defendants."

16.    The Individual Defendants, because of their position with the Company, possessed the power and authority to control the contents of Embecta's reports to the SEC, press releases, and presentations to securities analysts, money

5

and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.    Embecta is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Embecta under respondeat superior and agency principles.

6

**SUBSTANTIVE ALLEGATIONS**

*Company Background*

19.    Embecta describes itself as a leading global medical device company focused on providing solutions to improve the health and well-being of people living with diabetes.

*The Defendants Materially Misled Investors Concerning*

*the Embecta's 2026 Fiscal Year Guidance*

<u>*November 25, 2025*</u>

20.    On November 25, 2025, Embecta published a press release disclosing fourth quarter and full year 2025 financial results, as well as 2026 financial guidance. As part of the press release CEO Kurdikar stated, in pertinent part:

> Fiscal year 2025 marked the completion of the first phase of our strategic roadmap: one focused on major separation and stand-up activities, including implementing a global ERP system and operationalizing our own distribution network and shared services. We also initiated the second phase: seeding growth. By focusing on operational efficiency and executing restructuring, we were able to accelerate debt reduction and decrease our net leverage, creating additional financial flexibility for our goal to invest in growth. We remain committed to the initiatives announced at our 2025 Analyst and Investor Day, and in fiscal year 2026, we intend to maintain our global leadership position in our core product categories, execute on our new product programs, and generate strong adjusted operating margin and free cash flow. While the broader geopolitical and trade environment remains dynamic, we believe our global scale, resilient supply chain, and experienced teams position us well to build value for all stakeholders.

21. The same day, Embecta hosted an earnings call detailing the Company's 2025 financial results and 2026 guidance. As part of the call, CFO Elguicze stated, in relevant part:

> As R&D expenses were expected to increase from 2025 levels as we support key value creation initiatives through 2028. While SG&A expenses were expected to remain flattish as compared to 2025 levels. And despite a dynamic geopolitical and trade backdrop, I'm pleased to say that we believe our initial fiscal 2026 financial guidance is well aligned with the expectations established in our long-range plan. Beginning with revenue. On an adjusted constant currency basis, we currently anticipate that our revenues will be flat to down 2% as compared to 2025 levels. At the high end of our constant currency revenue range, we have factored in modest volume declines within our core injection business, primarily related to syringe declines within the U.S.
>
> *                *                *
>
> Turning to our thoughts on FX. Our initial guidance calls for a foreign currency tailwind of approximately 1.2% during 2026. This assumption is based on foreign exchange rates that were in existence in the early November time frame. Somewhat offsetting FX is an estimated 0.1% year-over-year headwind associated with the Italian payback measure, primarily driven by the favorable adjustment recognized in fiscal year 2025. ***On a combined basis, our as-reported revenue guidance calls for a range of between negative 0.9% to positive 1.1% resulting in an initial revenue guide of between $1.071 billion and $1.093 billion.*** Turning to adjusted operating margin. Our initial guidance range calls for a range of between 29% and 30% or lower by approximately 180 basis points at the midpoint as compared to 2025 levels. The expected decline at the midpoint is due to 2 factors contributing equally. First, adjusted gross margin is expected to decline due to increased cannula costs.
>
> While in terms of tariffs, based on current information, we expect incremental tariffs to have a negligible impact as compared to the prior year. And second, we anticipate R&D expense to approximate 2% of

8

revenue as we continue to invest in the development of market appropriate pen needles and syringes and advance our efforts to qualify and onboard alternate cannulas suppliers. SG&A as a percentage of revenue is expected to remain relatively consistent with fiscal 2025 levels. All totaled, our initial guidance range for adjusted operating margin aligns with the margin framework outlined in our Analyst and Investor Day and reflects our disciplined approach to balancing reinvestment for growth with sustained profitability as we advance through the next phase of our transformation.

***Moving to earnings. During 2026, our initial guidance calls for an adjusted diluted earnings per share range of between $2.80 and $3 and it's based on a weighted average diluted share amount of approximately 60 million shares. Our initial adjusted earnings per share range includes an assumption that during 2026 we will repay approximately $150 million in debt and that our annual net interest expense will be approximately $93 million. While from a tax perspective, our initial adjusted earnings per share range assumes that our adjusted tax rate will be approximately 23% as compared to approximately 25% in fiscal year 2025 due to tax planning initiatives we put in place, U.S. tax reform and lower interest expense.***

[Emphasis added].

### *January 14, 2026*

22.     On January 14, 2026, Embecta participated in the 44th Annual J.P. Morgan Healthcare Conference. As part of the presentation, CEO Kurdikar stated, in pertinent part:

I also mentioned that we have a very stable recurring revenue base. And you will see on this page, our revenue by product family and total going back through fiscal 2020. The first thing I want to point out is, over this period, there were a lot of external dynamics. Obviously, there was the COVID 2019 pandemic. But then this was also a period where there has been adoption of pumps, particularly in the U.S. the rapid growth in GLP-1 therapies.

But in spite of that, you see the stability in our product portfolio. In fact, if you look at the pen needles, our pen needles have stayed stable throughout. If you look at the safety products portfolio, that's grown at almost 5% adjusted constant CAGR over that time. Syringe has come down by approximately 5%. But that syringe decline is concentrated in the U.S. where there has been a steady decline in the use of insulin vials and obviously, as insulin vials are declining, the need for insulin syringes is declining. That's been a long-standing trend.

And the reason vials are declining, is really pens are more easier to use than vials for patients. So there has been a transition from vials to pen. Certainly, during COVID, it disproportionately affected seniors, so patient mortality, we think had an impact as well. And certainly, as new patients are getting diagnosed and they've been trained on injecting insulin. They are being used -- they're being trained to use pens.

Approximately 85% of our portfolio is pen needles and safety pen needles. And that is continuing to grow and sort of that's the takeaway here. Yes, stability in spite of external dynamics, and stability in spite of syringe decline being offset by pen needles and the safety product portfolio.

23. During the question-and-answer segment of the conference, CEO Kurdikar answered questions from analysts, in relevant part:

<Q: Caroline Borowski – J.P. Morgan – Vice President> So pen needles continue to show resilience despite GLP-1s and pumps. Can you talk a little bit about what's really driving that stability?

<A: Devdatt Kurdikar> *Yes. Look, I mean, our pen needle business is incredibly resolute.* First of all, again, just to stress a few points. These are medically necessary products. *I mean we are the unrivaled leader in this business.* But I think it's important to sort of think about this geographically as well, right?

I mean take Type 1 patients, they're approximately 10 million globally, only 1.5 million are in the U.S. and pump adoption in GLP-1 is still pretty much a U.S. phenomenon. If you think about Type 2 patients that use insulin, that's about 60 million to 70 million here only, about 7

million to 8 million are in the U.S. the rest are outside the U.S. So first of all, I think the understanding -- the fact that we are a geographically diverse company, where -- and we have strength in emerging markets where there are a disproportionate number of patients sort of puts our product usage in perspective.

Secondly, and as I mentioned before, GLP-1's most effective when actually there is insulin in the body. In fact, some of the data we've seen, there is a lot of concomitant use of GLP-1s with pen needles.

Thirdly, I mean, look, the insurance rate on Type 2 are still increasing. Obviously, GLP-1 is not indicated for Type 1, Type 2 is growing. And there are affordability constraints around the use of these products outside the U.S. So I think for all those reasons, our pen needles continue to strength.

*Maybe one final point, particularly as it relates to the U.S. One of the indicators we track is just what's happening with TRx, total prescriptions for insulin. And within that number, you can actually tease out what's happening for insulin vials versus what's happening for insulin pens. Insulin vials have been declining steadily. I talked about that. That impacts our syringe volume in the U.S. But insulin pens have been stable all throughout this period. again, sort of showing the underlying resilience and the durability of that portfolio. And frankly, over the past few quarters, NRx, which is new prescriptions for insulin pens have been showing a slight positive trend. And so again, just exemplifying the resilience of this product portfolio.*

<Q: Caroline Borowski> So market appropriate products sounds simple, but execution matters. What gives you confidence you can win in those segments?

<A: Devdatt Kurdikar> These are segments, frankly, that years ago, we used to participate in. I mean, actually at spin, we actually stepped out of some tender markets in a lot of these markets are tender markets, particularly Latin America because we didn't want to chase price now. And our idea then was and it's coming to fruition now was -- look, the products we have are not the best products for these markets. So let's step out of it and reenter with the market -- with the products that we believe will be right and we are there now.

Look, what gives me confidence is we understand the market dynamics because we used to be in that market. From an R&D and manufacturing perspective, I don't think there is anybody that has more capability than us to develop these products. I mean, we know these products inside out. And in fact, that's exemplified by just how rapidly our teams have made progress on this.

And so with the channel knowledge that we have, the distribution network that we have, with the R&D and the manufacturing capabilities that we have, I do believe that we are in a position to reenter those markets, and over time, grow our share. It's all going to be incremental. I want to stress the fact that these are not -- these new products we are developing are not for global distribution. They are meant for targeted markets and targeted segments. And obviously, you can control that with respect to where you register these products and where do you supply them and which are the channel partners that you use and they have some clarity in channels that you use for the premium product versus those that you use for these lower-priced products.

[Emphasis added].

12

*February 5, 2026*

24.    On February 5, 2026, Embecta published a press release disclosing first quarter 2026 fiscal results. As part of the press release, CEO Kurdikar stated, in pertinent part:

> During the first quarter our results were largely consistent with our expectations.
>
> As we look ahead, we remain focused on pursuing initiatives that will transform the company into a broad-based medical supplies company which serves chronic care patients and drug delivery partners. This includes maintaining our global leadership position in core injection products, expanding our product portfolio, and creating additional financial flexibility through ongoing debt reduction. Given our performance during the first quarter, coupled with our outlook for the remainder of the year, we are maintaining our previously provided guidance for key financial reporting metrics.

25.    The same day, Embecta hosted an earnings call detailing the Company's 2026 fiscal guidance. CEO Kurdikar stated, in relevant part:

> Today, we reaffirmed our previously provided financial guidance ranges.

26.    Also during the earnings call, CFO Elguicze reaffirmed Embecta's guidance, in pertinent part:

> That completes my prepared remarks on our first quarter 2026 results. Next, I would like to discuss our 2026 financial guidance and certain underlying assumptions.
>
> Beginning with revenue. On an adjusted constant currency basis, we are reaffirming our previously provided guidance range, which called for revenue to be flat to down 2% as compared to 2025 levels.

13

Turning to our thoughts on FX. We are reaffirming our previously provided guidance, which called for foreign currency to be a tailwind of approximately 1.2% during 2026. Likewise, we are reaffirming our previously provided guidance associated with the Italian payback measure of an estimated 0.1% year-over-year headwind.

On a combined basis, our as-reported revenue guidance continues to call for a range of between negative 0.9% to positive 1.1%, resulting in a revenue guide of between $1.71 billion and $1.93 billion. As Dev previously mentioned, we currently expect that we'll be closer to the lower end of that range.

Turning to adjusted operating margin and adjusted diluted earnings per share. We are also reaffirming those previously provided guidance ranges of between 29% and 30% for adjusted operating margin and for between $2.80 and $3 in terms of adjusted EPS. Like my comments regarding our expectations concerning revenue, we currently expect to be closer to the lower end of those ranges because of the incremental headwinds we are now anticipating within the U.S. during the first half of the year.

27.    The above statements in Paragraphs 20 to 26 were false and/or materially misleading. Defendants created the false impression that Embecta was providing accurate and reliable fiscal guidance for second quarter and full year 2026. In particular, Embecta knew or recklessly disregarded that segment weakness, especially in the United States pen needle market, was likely to disrupt the Company's original revenue guidance and second quarter 2026 results. Instead, management reaffirmed guidance during the Company's first quarter 2026 earnings call and highlighted Embecta's strength during the J.P. Morgan Healthcare Conference in January 2026.

14

*The Truth Emerges*

*<u>May 5, 2026</u>*

28.    On May 5, 2026, Embecta published a press release disclosing second quarter fiscal 2026 financial results. As part of the press release, CEO Kurdikar stated, in pertinent part:

> ***We were disappointed with our second quarter results as they were significantly below our expectations***, driven by a combination of factors which impacted our U.S. business, including increased competitive dynamics and softness in overall market volumes. Our International business performed in line with expectations.
>
> Given our results, we have initiated a review of our cost structure and organizational footprint and expect to communicate findings and any resulting actions to investors once that process is complete. Our lowered financial guidance assumes that the dynamics which impacted our U.S. business during the second quarter will continue for the balance of the year, as well as the addition of Owen Mumford.
>
> What gives us a constructive backdrop against which to manage through this period is the continued progress we are making in achieving important milestones on our strategic priorities and building embecta into a broader medical supplies company. On the strategic front, the pending acquisition of Owen Mumford remains on track to close during May 2026, following satisfaction of all closing conditions and regulatory approvals. This transaction will broaden our product portfolio beyond insulin injection delivery devices, significantly strengthen our B2B drug delivery platform, and it is consistent with the diversification strategy we presented at our 2025 Investor Day.
>
> Despite the reduction in our revenue and profitability guidance ranges, we continue to expect to repay approximately $150 million in debt during 2026. We also adjusted our capital allocation framework this quarter, as our Board authorized a three-year share repurchase program of up to $100 million. ***Concurrently, we are reducing our quarterly cash dividend from $0.15 to $0.01 per share.*** Redirecting our regular

15

dividend gives us increased flexibility to deploy capital towards share repurchases or additional debt reduction, consistent with our objective of long-term shareholder value creation.

[Emphasis added].

29.    The same day, Embecta hosted an earnings call detailing second quarter 2026 fiscal results. As part of the earnings call, CEO Kurdikar stated, in relevant part:

> This was a difficult quarter for embecta. Our results were below expectations with consolidated revenues down 14.4% year-over-year on an as-reported basis or 17.4% on an adjusted constant currency basis. As a result, we are updating our full year guidance to account for the underlying factors that impacted performance during the quarter and that we expect to persist for the remainder of the year.
>
> *    *    *
>
> Turning to the second quarter. While our International business performed in line with our prior outlook, our U.S. business fell short of expectations due to a combination of factors that I'm going to take you through now. The largest contributor to the lower year-over-year U.S. revenue is share loss within our pen needle product category, most of which is concentrated at a single customer.
>
> We estimate that the remainder is spread across smaller regional and independent pharmacy customers. It is important to understand that the patients switching to competitive products are likely not on payer plans where we have preferred access. That means that the revenue impact of the switching is estimated to be greater than what is indicated by an average unit price.
>
> The second largest contributor is overall market volume softness for insulin pens and pen needles in the retail channel. We believe this contributes to most of the remaining pen needle revenue decline.

And as it relates to the insulin pen market, we are seeing signs of decline in overall insulin pen prescriptions. This is driven by a decline in the retail channel, but is being partially mitigated by growth in the long-term care channel. We are also seeing volume softness in longstanding accounts where we have a stable share position.

Additionally, more patients choosing to acquire pen needles from channels where we do not participate or where products are lower priced is driving additional pressure on retail pen needle volumes. The remaining pen needle decline is related to inventory reductions at certain accounts and additional net pricing pressure.

Finally, a reduction in syringe and safety products revenue comprised the remainder of the overall U.S. revenue decline. *As a result, we are revising our fiscal 2026 revenue guidance to a range of between $1.015 billion and $1.035 billion. This reflects both the U.S. revenue shortfall in the second quarter and our updated expectations in the U.S. for the remainder of the fiscal year.*

International is performing as expected, and our outlook there is unchanged. Additionally, the revised range includes approximately $30 million in revenue contribution from the acquisition of Owen Mumford, which is expected to close by the end of this month. *This compares to our previous guidance range of between $1.071 billion and $1.093 billion.*

\*       \*       \*

Pen needles account for approximately 70% of the $75 million revenue guidance reduction or approximately $53 million. Given that pen needle market volume estimates can be somewhat imprecise, it is not possible to exactly calculate the individual contributions of competitive share loss and market volume softness on our product volumes.

Our estimate is that share loss accounts for nearly half of the pen needle revenue reduction or approximately $25 million, while overall market volume softness is estimated to account for approximately $20 million. The remaining pen needle headwinds we are seeing are related to inventory reductions at certain accounts and additional net pricing

17

pressure, which together accounts for approximately $8 million of the revenue guidance reduction.

Turning to syringes. They account for approximately $13 million of the remaining $22 million revenue guidance reduction, most of which stems from lower syringe use associated with compounded drugs.

While our decision to discontinue our swab products accounts for approximately $5 million of the revenue guidance reduction. For context, in late 2025, our sole supplier of the active ingredient in our alcohol swabs exited the API manufacturing space.

Despite extensive efforts, we were unable to qualify an alternate supplier under applicable FDA standards. And while we remain committed to supporting our customers and patients through this transition, we recently made the decision to cease production of alcohol swaps. This product line had lower gross margins than our insulin injection devices.

Finally, a reduction in estimated growth of safety products accounts for the remaining amount of approximately $4 million. Our guidance assumes that share loss and softness in market volumes persist throughout the remainder of the year without any further deterioration or recovery.

Taken together, these are the drivers behind our performance in the second quarter as well as the full year revenue guidance revision. Considering the magnitude of the guidance reduction, we have initiated a review of our cost structure and organizational footprint. We will communicate findings and resulting actions as part of our standard quarterly reporting once that work has been completed.

[Emphasis added].

30.    Also during the earning call, CFO Elguicze stated, in pertinent part:

Next, I'd like to discuss our updated 2026 financial guidance and certain underlying assumptions. Beginning with revenue. On an as-reported basis, we are lowering our guidance from a range of between $1.071

billion and $1.093 billion to a range of between $1.015 billion and $1.035 billion.

This new range assumes an organic as-reported revenue range of between $985 million and $1.05 billion. It also assumes that we will close the acquisition of Owen Mumford by the end of this month, which would then generate 4 months of contribution or approximately $30 million.

In terms of adjusted operating margin, given the expected decline in U.S. revenue as compared to our prior projections, we are lowering our adjusted operating margin guidance from a range of between 29% and 30% to a new range of between 22.25% and 23.25%.

We are also lowering our adjusted earnings per share guidance from a range of between $2.80 and $3 to a new range of between $1.55 and $1.75. The largest driver of this reduction is the impact of the lower U.S. revenue and associated gross profit, which accounts for most of this change.

In addition to the U.S. revenue and gross profit impact, the addition of Owen Mumford, including the interest expense on the associated borrowings is expected to be dilutive by approximately $0.15.

Over the longer term, we continue to expect that the acquisition of Owen Mumford will contribute to revenue growth in fiscal year 2027 and beyond, that OM will be immaterial to embecta's fiscal year 2027 adjusted operating income and to be accretive thereafter, that OM will be dilutive to adjusted net income in fiscal year 2027 to be immaterial to embecta's fiscal year 2028 adjusted net income and to be accretive thereafter, and that the acquisition will generate high single-digit return on invested capital by year 4 with increasing contribution thereafter.

Lastly, because of the lower expected U.S. profitability, coupled with the addition of Owen Mumford, we now expect that our adjusted tax rate will increase from approximately 23% to approximately 28%, thereby reducing our adjusted EPS as compared to our prior expectations by approximately $0.10.

19

Turning to the balance sheet and cash flow. Despite the reduction in our revenue and profitability guidance ranges, we continue to target repaying approximately $150 million in debt during 2026.

Lastly, in terms of free cash flow and inclusive of the addition of Owen Mumford, we now expect to generate free cash flow of between $95 million and $105 million. This compares to our prior guidance range of between $180 million and $200 million. This updated guidance range includes approximately $40 million in one-time use of cash associated with brand transition and the Owen Mumford acquisition.

31.    During the question-and-answer segment of the earnings call, CEO Kurdikar responded to questions from analysts, in relevant part:

<Q: Marie Yoko Thibault – BTIG – Analyst> I want to spend a little time better understanding the U.S. weakness this quarter and assumptions going forward. I think you said in your commentary that in the U.S. pen needle segment, the losses were concentrated at a single customer. I wanted to understand if that was the same customer as was referenced last quarter, where there were pricing concessions made and why, if so, the volumes weren't stabilized by that move?

And then secondly, you called out weakness in insulin pen prescriptions. Can you tell us a little bit more about what's driving that? Could that be short-lived? Or is that a long-term trend?

<A: Devdatt Kurdikar> Let me start by taking the market question first on insulin pens and pen needles, and then go to the competitive loss question. So first on insulin pens, if we look at prescriptions for insulin pens, we have now begun to see a decline maybe more pronounced in the most recent quarter that we reported. That decline is actually greater in the retail channel than it is in other channels. And insulin pens are sold primarily in retail, but some in long-term care and very little in the specialty care channel.

So insulin pen is mostly stored and sold in retail, and there has been a decline. That decline is greater in long-acting than fast-acting. And it

seems to be driven by a decline in new prescriptions. That obviously translates into the pen needle market as well, but maybe a bit exacerbated in the pen needle market because what we are also seeing is a decline in retail that maybe is a little bit faster for pen needles than there is for insulin pens.

Now some of this is likely being caused by shift in purchasing patterns from retail to perhaps lower cost channels or where pen needles are available at a lower price. We've also seen declines in accounts, as I referenced, where we believe we have a stable share position, so more indicative of market than anything else. And those are the market trends that we are seeing. Of all the variables that we try to account for in our guidance, this is perhaps the one where there is maybe more uncertainty because what we are observing is more of a recent shift than certainly what we've seen over the past several years. So that's about the market.

Now with respect to the competitive loss, yes, it was the same customer that we had referred to earlier. Obviously, I don't want to talk about pricing at any specific customer or even broadly in the U.S. market. But I think what we've ended up is the share loss at that customer is a little bit deeper than we anticipated.

But I want to point out a couple of factors that I referenced in my prepared remarks. So when there is a shift in share at a particular retailer, we believe that much of that share loss occurs with patients who are not on preferred plans with us. And so they can move to a different brand of pen needles and still use their insurance plan. And so when that happens, the revenue impact of that share loss is higher since if we are not on a preferred plan for that patient, obviously the rebate amount for that payer plan is less for us.

Secondly, while, yes, most of that competitive loss was concentrated at the aforementioned account, we are seeing some declines in smaller regional players as well as independent pharmacies. Now with these smaller regional players and independent pharmacies, the rebates that these retailers get are obviously less than our large customers. And so that has an impact on the revenue as well. And so the competitive share loss affects us maybe at a higher rate than one might imagine just by using an average unit price.

21

So those are the 2 factors that are impacting the U.S. results this quarter and drove the majority of the guidance revision for the year.

32.    The aforementioned press releases and statements made by the Individual Defendants or otherwise about the Company are in direct contrast to their public statements made during the Class Period. In those statements, Defendants continuously made representations to investors regarding the Company's guidance and the strength of Embecta's segments. In particular, Defendants continuously reaffirmed guidance and frequently touted Embecta's pen needle segment as "resolute," while failing to consider the impact of patients not on payer plans.

33.    Investors and analysts reacted immediately to Embecta's revelation. The price of Embecta's common stock declined dramatically. From a closing market price of $9.25 per share on May 4, 2026, Embecta's stock price fell to $3.90 per share on May 5, 2026, a decline of over 57.8% in a single day.

34.    A number of well-known analysts who had been following Embecta lowered their ratings in response to Embecta's disclosures. For example, BTIG published a report detailing Embecta's "major miss" and "guidance cut," while downgrading to Neutral from Buy.

22

35.     Similarly, on May 6, 2026, Wolfe Research published a report titled "EMBC: Ouch! Injection of FY2Q26 Info Stings. US Needs a Bandaid." In the report, Wolfe stated, in pertinent part:

The Wolfe Byte.

Lower estimates on US underperformance. Share loss in pen needles and 'overall market volume softness' the largest drivers of the negative delta. FY26 EPS guide cut ~40%. Stock down ~55%. EMBC here trading ~2.5x FY26 earnings.

FY2Q missed. Revenue $222M was down ~17% cFX and missed Street by ~6%. US underperformed plan while OUS hit. US declined ~29%. OUS declined ~4% cfx. Gross margin was 59.4%, down ~430bps YY and missed by ~250bps. EBIT margin was21.9%, down ~950bps YY and missed by ~150bps. Net, EPS was 27c, down 61% YY and missed Street by ~15c or 35%.

US…oofa. 4 key drivers: 1) Pen needle share loss. Most of the loss concentrated at a large single customer with a tail across smaller regional and independent pharmacy customers. Belief is most share loss is among patients not on payer plans thus lack preferred access. 2) Market volume softness in insulin pens and needles in retail. EMBC citing declines in pen prescriptions and volume softness in long-standing accounts where share is stable. Also saying patients getting needles from channels where EMBC does not participate and/or where prices are lower which is driving additional pressure on retail volume. EMBC belief is GLP1 affordability and ACA mandates could be influences here. 3) Inventory reductions and incremental net pricing pressure in pen needles. 4) Reduction in syringe and safety products the remainder of the US decline.

23

36.    Also on May 6, 2026, Mizuho lowered its price target for Embecta to $5.00 from $12.00, stating, in relevant part:

EMBC put up a F2Q -$14mn top-line miss driven by a weak US performance (-$17mnmiss) driven by a combination of competitive and underlying market pressures. The bulk of US miss was triggered by pen-needle share loss with majority coming from one large customer coupled with market softness for insulin pens and pen-needles in the retail channel on a mix of lower ASP competition and lower prescriptions. Despite continued China headwinds, OUS sales were in line with company expectations. With latest dynamics, management cut FY26 top-line guidance by -$57mn and adj EPS -$1.25both at the midpoint. Looking ahead, share recapture on lost retail share will take time to execute while competitive pressures from low-cost providers and to some extent GLP-1sare expected to persist at least over the NT. With visibility on time to stabilizing volumes unclear, we cut #s and stay Neutral. PT to $5 from $12.

*Additional Scienter Allegations*

37.    During the Class Period, Defendants acted with scienter in that they knew or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Embecta were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the strength of Embecta's pen needle business and the impact patients not on payer plans would have on sales, thus negatively impacting second quarter and full year 2026 revenue and guidance.

38.    In fact, Defendants knew or deliberately disregarded that the Company's fiscal year 2026 guidance would be directly impacted by segment weakness in the United States. Defendants knew or deliberately disregarded segment

24

weakness issues, particularly in the United States pen needle segment. Despite such knowledge, Defendants continuously reaffirmed fiscal year 2026 guidance and publicly touted the Company's strength in the pen needle sector, including just weeks prior to the truth emerging. The temporal proximity between Defendants' false and misleading statements and the revelation of the truth concerning Defendants' revised guidance weighs heavily in favor of intentional and/or reckless conduct.

*Loss Causation and Economic Loss*

39.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Embecta's common stock and operated as a fraud or deceit on Class Period purchasers of Embecta's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Embecta's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Embecta's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

40.    Embecta's stock price fell in response to the corrective event on May 5, 2026, as alleged *supra*. On May 5, 2026, Embecta published a press release

disclosing second quarter 2026 fiscal results that missed the Company's estimates and, subsequently, lowered fiscal year 2026 guidance.

41.     In particular, on May 5, 2026, Embecta revealed that second quarter 2026 revenue was $221.8 million, a decrease of 14.4% year-over-year, much more pronounced than the guidance of "flat" to "down 2%." The Company attributed the decline mainly to pen needle sale weakness in the United States. Embecta subsequently lowered fiscal year 2026 guidance to a range of $1.015 billion and $1.035 from $1.071 billion and $1.093 billion.

*Presumption of Reliance; Fraud-On-The-Market*

42.     At all relevant times, the market for Embecta's common stock was an efficient market for the following reasons, among others:

a.     Embecta's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

b.     Embecta communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

26

c.    Embecta was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

d.    Unexpected material news about Embecta was reflected in and incorporated into the Company's stock price during the Class Period.

43.    As a result of the foregoing, the market for Embecta's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Embecta's stock price. Under these circumstances, all purchasers of Embecta's common stock during the Class Period suffered similar injury through their purchase of Embecta's common stock at artificially inflated prices, and a presumption of reliance applies.

44.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor

27

might have considered the omitted information important in deciding whether to buy or sell the subject security.

*No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

45.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they led investors to believe that Embecta's revenue guidance was accurate and that the Company's pen needle segment was performing well. In fact, Embecta's frequently touted United States pen needle business was underperforming, causing Embecta to fail to meet its previously issued revenue guidance and negatively revise its full year fiscal 2026 guidance.

46.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

47.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an

28

executive officer of Embecta who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

48.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Embecta's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

49.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Embecta's common stock were actively traded on the NASDAQ. While the exact number of Class members is

29

unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Embecta or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of April 28, 2026, there were approximately 59.3 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

30

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Embecta;

c.      whether the Individual Defendants caused Embecta to issue false and misleading financial statements during the Class Period;

d.      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.      whether the prices of Embecta's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

54. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Embecta common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Embecta's securities at

artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

57.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Embecta's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

58.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

33

59.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Embecta's internal affairs.

60.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individuals Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Embecta's businesses, operations, future financial condition, intellectual property, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Embecta's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Embecta's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

34

61.    During the Class Period, Embecta's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Embecta's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Embecta's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Embecta's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

62.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock

during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

64.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Embecta's misstatements.

66.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Embecta which had become materially false or misleading.

67.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Embecta disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout

the Class Period, the Individual Defendants exercised their power and authority to cause Embecta to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Embecta's common stock.

68. The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and/or being directors of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause Embecta to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

69. By reason of the above conduct, the Individual Defendants and/or Embecta are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

37

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: June 17, 2026                          Respectfully submitted,

                                              **LEVI & KORSINSKY, LLP**


                                              */s/ Adam M. Apton*
                                              Adam M. Apton
                                              33 Whitehall Street, 27th Floor
                                              New York, New York 10004
                                              Tel.: (212) 363-7500
                                              Fax: (212) 363-7171
                                              Email: aapton@zlk.com

                                              *Attorneys for Plaintiff*