Karina Kosharskyy (#029362007)
Andrew M. McNeela
Ira M. Press
Lauren K. Molinaro
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: 212-371-6600
Email: kkosharskyy@kmllp.com
amcneela@kmllp.com
ipress@kmllp.com
lmolinaro@kmllp.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HARRISON APITZ-GROSSMAN, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>EMBECTA CORP., DEVDATT KURDIKAR and JACOB P. ELGUICZE,<br><br>Defendants. | Case No. 2:26-cv-07217<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

# TABLE OF CONTENTS


TABLE OF FISCAL QUARTERS .......... iv

I. NATURE OF THE ACTION AND OVERVIEW .......... 1

II. JURISDICTION AND VENUE .......... 12

III. PARTIES .......... 13

A. Plaintiffs .......... 13

B. Defendants .......... 13

IV. FACTUAL BACKGROUND .......... 15

A. Embecta's History and Operations .......... 15

B. Embecta's Pricing Strategy and Dynamics .......... 17

C. Embecta's Strategic Plan .......... 20

D. Defendants Begin the Class Period With Fiscal 2026 Guidance Appearing to Support Embecta's Strategic Plan .......... 27

E. Defendants Appear to Advance the Strategic Plan by Acquiring Owen Mumford .......... 29

F. Throughout the Class Period, Defendants Are Aware of but Fail to Disclose Either the Risk of Material Share Loss at Walgreens or the Materialization of That Risk .......... 31

1. Walgreens, as One of Embecta's Largest and Most Important Customers, Was Material to Embecta's Business .......... 32

2. Following Private Equity's Acquisition of Walgreens in Mid-2025, Walgreens' Management Promises Renewed Focus on Operational Discipline .......... 37

3. Walgreens Revises Its Pharmacy Procurement to Privilege Up-Front Discounts Over Contingent, Back-End Volume-Based Discounts .......... 38

4. Even Prior to the Class Period, Embecta Begins Losing Walgreens Share to Lower-Priced Competitor HTL-Strefa .......... 42

5. Embecta Seeks to Defend Its Walgreens Share With Price Concessions That Remain Dependent on Contingent Back-End Rebating and Come as 'Too Little, Too Late' ......44

6. No Later Than December 2025, Walgreens Displaces Embecta and Installs HTL-Strefa as Its Preferred Provider of Pen Needles and Syringes ......46

G. Throughout the Class Period, Defendants Knew but Omitted to Disclose That the Sole, FDA-Qualified Supplier of the Active Ingredient Used in Embecta's Alcohol Swab Product Line Had Exited the Market, Forcing the Discontinuation of That Entire Line of Products ......47

H. Defendants' Belated May 5, 2026 Disclosures Reveal Material Deterioration in Embecta's Core Business That Invalidates the 2026 Guidance and Threatens to Scupper the Strategic Plan ......48

I. Post-Class Period Developments at Embecta Signal That the Company Recognized the Need to Reverse Course ......57

V. DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS ......59

A. Defendants' November 25, 2025 Disclosures ......59

1. The 2026 Guidance ......60

2. Defendants' Characterization of Embecta's Q4 2025 Results ......63

3. Materially Misleading Risk Disclosures in Embecta's 2025 10-K ......68

B. Defendants' January 14, 2026 Disclosures ......77

C. Defendants' February 5, 2026 Disclosures ......82

D. Defendants' Violations of Item 303 of Regulation S-K ......89

1. Operative Item 303 Disclosure Requirements ......89

2. Defendants' Item 303 Disclosures Were Marred by Material Omissions ......90

E. Defendants' Dividend-Related Disclosures ......94

VI. ADDITIONAL SCIENTER ALLEGATIONS ....................................... 102

A. Defendants' Access to Real-Time Data ............................................ 102

B. Kurdikar's Post-Class Period Admissions Indicate Defendants Had Been Aware of Walgreens' Share Loss/Risk Even Prior to the Beginning of the Class Period ..................................................... 106

C. Defendants' *Scienter* Can Be Inferred Because Pen Needles and Walgreens Sales Constituted Embecta's Core Operations ................. 109

VII. LOSS CAUSATION ........................................................................ 110

VIII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ......................................... 112

IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ................................... 115

X. CLASS ACTION ALLEGATIONS ....................................................... 116

XI. CLAIMS FOR RELIEF ........................................................................ 119

XII. PRAYER FOR RELIEF ....................................................................... 126

XIII. JURY TRIAL DEMANDED ................................................................ 127

## TABLE OF FISCAL QUARTERS

Embecta's fiscal year ends on September 30. The table below shows the calendar period covered by each fiscal quarter referenced in this Amended Complaint, and the date on which Defendants reported Embecta's results for that quarter.

| Fiscal Quarter | Calendar Period | Results Reported |
|---|---|---|
| **Q4 2025** | July 1 – Sept. 30, 2025 | Nov. 25, 2025 (2025 10-K) |
| **Q1 2026** | Oct. 1 – Dec. 31, 2025 | Feb. 5, 2026 (Q1 2026 10-Q) |
| **Q2 2026** | Jan. 1 – Mar. 31, 2026 | May 5, 2026 (Q2 2026 10-Q) |
| **Q3 2026** | Apr. 1 – June 30, 2026 | Aug. 7, 2026 (Q3 2026 10-Q) |

Court-appointed Lead Plaintiff John Watson (hereinafter, "Lead Plaintiff") and additional plaintiff Harrison Apitz-Grossman (together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation: (i) review and analysis of regulatory filings made by Embecta Corp. ("Embecta" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and media reports issued and disseminated by Embecta; (iii) review of reports concerning Embecta issued by industry and securities analysts; and (iv) other information obtained on the internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of all persons or entities who purchased or otherwise acquired Embecta common stock between November 25, 2025 and May 4, 2026, inclusive (the "Class Period"), and were

[1] All references to "ECF No. __" refer to documents filed in the above-captioned action. All emphasis is added unless otherwise noted.

damaged thereby. Plaintiffs assert claims arising under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Embecta, its Chief Executive Officer ("CEO") Devdatt Kurdikar ("Kurdikar"), and its Chief Financial Officer ("CFO") Jacob P. Elguicze ("Elguicze," and collectively with Embecta and Kurdikar, "Defendants").

2. Prior to the Class Period, Defendants publicly propounded a Strategic Plan (defined in Section IV.C, *infra*) built on Embecta acquiring faster-growing, adjacent businesses that would ultimately propel Embecta to growth, *i.e.*, Embecta would "buy growth." The *sine qua non* of this plan entailed Embecta keeping revenues steady in the near to mid-term, so that Embecta would be able to generate sufficient earnings and cash flows to: (i) acquire adjacent businesses, **and** (ii) maintain its customary dividend payments to shareholders (which was a major incentive for investors and a substantial driver of the value of Embecta's shares).

3. At the start of the Class Period in November 2025, Defendants issued financial guidance for fiscal year 2026 indicating that Embecta's performance would accord with these Strategic Plan objectives: stable revenues, generating substantial earnings sufficient to fund both dividend and acquisition plans. Throughout the Class Period, Defendants repeated this same message, notwithstanding their awareness of a materializing risk – specifically, escalating share losses at one of

Embecta's largest customers: Walgreens. That share loss left Embecta with materially **declining** revenues that: (i) cracked the very foundation of Embecta's Strategic Plan; (ii) caused Embecta's fiscal 2026 financial performance to fall materially short of Defendants' fiscal 2026 guidance; and (iii) restricted Embecta's ability to support the same level of dividend payments. On May 5, 2026, when Defendants belatedly revealed that the risks they concealed throughout the Class Period had materialized, Embecta's share price dropped *by more than 50% in a single day*. This action seeks damages for investors harmed by Defendants' fraud.

4. Embecta was formed in April 2022, when Becton, Dickinson and Company ("Becton Dickinson") spun off its market-leading diabetes care operations. Embecta's principal business is the manufacture and sale of insulin injection devices, primarily: (i) "pen needles" (single-use needles inserted onto the business end of insulin injection pens); (ii) insulin syringes (an older, less convenient method of insulin injection); and (iii) "safety" versions of both such products that include additional features protecting against accidental needlestick exposure. Embecta is a market leader in each of these product categories, manufacturing more than 8 billion units per year and selling them in more than 100 countries. Pen needles were Embecta's flagship product, accounting for approximately three-quarters of the Company's total net revenues in fiscal years 2024 and 2025 (75% and 73%, respectively).

5. Between Embecta's 2022 spinoff and mid-2025, Defendants were focused on taking the actions necessary to enable Embecta to "stand up" on its own as an independent company, which they called "Stand Up" matters. Accordingly, during that period, Embecta incurred substantial, non-recurring "Stand Up" costs.

6. However, by mid-2025, after Defendants had completed these Stand Up activities and the associated costs had ceased, Embecta's ability to generate positive earnings and substantial free cash flow was restored. At that time, Defendants' focus turned to the future and how to confront the limitations of the diabetes care business.

7. In the U.S. and other developed markets, diabetes care – especially in the segments in which Embecta operates – is a "mature" industry. While leading-edge segments of the diabetes care market (in which Embecta does not participate) continue to grow, the legacy insulin delivery mechanisms in which Embecta specializes are stagnant: insulin pen usage is at best stable, and the use of syringes is declining.

8. In mid-2025, Defendants devised and publicized a Strategic Plan that laid out a path for Embecta to transcend the limitations of its market and propel Embecta to growth through "inorganic" means, *i.e.*, by acquiring another business operating in an adjacent, but **faster-growing**, drug delivery and/or medical supplies field (referred to herein as the "buy growth" strategy). This would allow Embecta

to break out of the diabetes care cage that currently constrained it and blossom into a broader medical supply company with faster-growing and more diversified product offerings.

9. However, to "buy growth," Defendants first had to be able to afford it. To that end, the near-to-mid-term portion of Defendants' Strategic Plan envisioned Embecta holding revenues steady during fiscal 2026 through 2028, with any minor revenue declines in Embecta's "core injection business" being offset by minor revenue gains from various "organic" growth initiatives that Defendants identified. According to Defendants, this revenue stability would allow Embecta to generate earnings and cash flows sufficient to both (i) provide Embecta with the "financial flexibility" needed to "buy growth," **and** (ii) maintain quarterly dividend payments to shareholders at current levels ($0.15 per share).

10. The Class Period begins on November 25, 2025, when Defendants publicly issued financial guidance for fiscal year 2026 (the "2026 Guidance"), indicating that Embecta would meet these Strategic Plan requirements during the coming year.

11. Specifically, Defendants' 2026 Guidance represented that: (i) Embecta's fiscal 2026 revenues would stay essentially stable (*i.e.*, match fiscal 2025 levels), which (ii) would allow Embecta to generate free cash flows sufficient to fund

Embecta's current level of dividend payments while also providing Embecta with the necessary "financial flexibility" to "buy growth."

12. Defendants repeated these messages throughout the Class Period, even as Embecta's U.S. revenues exhibited year-over-year **declines**: a 15.2% decline in the fourth quarter of fiscal 2025 (the quarter ended September 30, 2025) and a 7.6% decline in the first quarter of fiscal 2026 (the quarter ended December 31, 2025). These declines were indicative of material deterioration in Embecta's core business, which appeared to be performing at levels below those set forth in the 2026 Guidance and Strategic Plan.

13. Defendants explained away both declines without disclosing the deterioration in Embecta's core business that was actually driving them. According to Defendants, these declines were of no real concern because they purportedly resulted from a variety of one-time events that had inflated the **prior-period** revenues (*e.g.*, distributor orders placed ahead of a threatened 2024 port strike and ahead of the July 4, 2025 holiday) to which these current period revenues were now compared. In other words, according to Defendants, the results were not problematic in and of themselves, but only looked concerning because they were being compared to prior financial results that were atypical.

14. However, contrary to Embecta's public representations, Embecta's core business was deteriorating, and this deterioration was concentrated in and

driven by one specific factor – escalating and material share losses at one of Embecta's largest customers, Walgreens.

15. Even as Defendants publicly dissected the operational minutiae of the one-off events purportedly responsible for Embecta's past and current financial performance, Defendants remained steadfastly silent throughout the Class Period concerning material developments, materializing risks, and escalating share losses at Walgreens. Specifically, Defendants were contemporaneously aware of, yet failed to disclose, that:

A. Prior to Class Period inception, Walgreens was shifting its medical product purchasing preferences to privilege more transparent pricing, based on concrete, up-front price discounts from suppliers, over more opaque pricing, based on contingent, volume-based "back end" discounting (which suppliers provided retroactively, based on sales volume levels) – a shift that was anathema to Embecta, whose "premium" pricing strategy was premised on the latter and could not accommodate the former;

B. Relatedly, beginning prior to the Class Period, Embecta, which had enjoyed near 100% share at Walgreens due to its status as Walgreens' "preferred" provider of pen needles and syringes, began losing share to a competing supplier, HTL-Strefa, which

offered substantially lower-priced products *via* superior up-front discounting, the very pricing structure Walgreens preferred;

C. Embecta was aware of the foregoing, and made further pricing concessions to Walgreens between early 2025 and September 2025 in a last-ditch effort to stave off share loss and preserve its relationship with Walgreens, but these concessions were insufficient, in part because they remained predicated on a contingent, back-end volume-based rebating mechanism, rather than up-front discounting, and thus proved "a day late and a dollar short"; and

D. As a result, by no later than mid-December 2025 (*i.e.*, three weeks after Class Period inception), Walgreens decided to replace Embecta with HTL-Strefa as its "preferred" pen needle and syringe provider and directed its pharmacies to utilize HTL-Strefa products when filling customer prescriptions, causing Embecta's share of Walgreens' business to plunge from above 90% to below 50%.

16. Notably, *even after* Walgreens had replaced Embecta with HTL-Strefa, Defendants continued to misleadingly describe Embecta's pen needle business as "incredibly resilient" and "contin[uing] to show strength."

17. Simply put, the adverse developments at Walgreens were an iceberg placed directly in Embecta's path. While Defendants, helming Embecta's ship, were long aware that Embecta was heading straight towards a collision, they neglected to inform Embecta's passengers (Plaintiffs and the Class) of the looming danger, so that, at all times until the crash came, Plaintiffs and the Class never saw it coming.

18. Throughout the Class Period, Defendants also failed to disclose that an entire ancillary business line – the manufacture, distribution, and sale of alcohol swabs – had been undermined by the market exit of Embecta's sole, U.S. Food and Drug Administration ("FDA")-qualified supplier of the swabs' active ingredient **in late 2025, at the beginning of the Class Period**. As a result, Embecta was forced to discontinue the product line (constituting a further blow to Embecta's 2026 revenues).

19. The Class Period ends on May 4, 2026. On the following day, Embecta disclosed that:

A. Embecta's financial results for the second quarter of fiscal 2026 (*i.e.*, the quarter ended March 31, 2026), had exhibited steep and material revenue declines, due primarily to material share loss at a large "single customer," namely, Walgreens;[2]

---

[2] Although Defendants did not name this "single customer" on May 5, 2026, Walgreens was identified as that "single customer" by at least one research analyst. *See* ¶ 109, *infra*. This identification is corroborated by (i) Defendants' commentary

B. Embecta's fiscal 2026 revenues would not remain steady but would instead decline materially from fiscal 2025 levels – again, due substantially to Embecta's share loss at Walgreens, as well as the discontinuation of Embecta's alcohol swab business – fatally undermining the Strategic Plan and 2026 Guidance, both of which were premised on revenue stability;

C. Embecta's fiscal 2026 top-line revenue shortfalls would in turn materially crimp Embecta's fiscal 2026 bottom-line earnings and cash flows (with adjusted EPS guidance cut by more than 40%, from \$2.80–\$3.00 to \$1.55–\$1.75, and free cash flow guidance roughly halved, from \$180–\$200 million to \$95–\$105 million); and

D. In light of these shortfalls, Defendants would effectively eliminate Embecta's quarterly dividend to shareholders, which Defendants reduced from \$0.15 per share to \$0.01 per share.

20. The market's re-evaluation of Embecta's worth, following Defendants' May 5, 2026 revelations, was swift and severe. By trading close on May 5, 2026,

concerning that customer (namely, that it was the "same customer" that Defendants had mentioned in a prior conference call, when discussing pricing discounts they had then provided to "a large U.S. pharmacy customer"); and (ii) communications between Walgreens personnel discussing Walgreens' shift away from Embecta to a competing provider of pen needles and syringes. *See* ¶¶ 97–98 and n.26, *infra*.

Embecta shares plummeted sharply from their $9.25 closing price the prior day (May 4, 2026) to close trading at only $3.90 per share – a single-day decline of $5.35 per share, or 57.8%.

21. The decline reflected the market's judgment that deterioration in Embecta's core business, revealed on May 5, 2026, had undermined the investment "thesis" for Embecta. Share loss at a single large customer drove the revenue decline; the resulting revenue shortfall meant Embecta could no longer generate enough cash flow to pay down debt and maintain the dividend, both of which the Strategic Plan assumed. For example, as BTIG analyst Marie Thibault wrote in a report published on May 5, 2026:

> **[O]ur prior Buy thesis was predicated on management's demonstrated ability to maneuver through market and macroeconomic headwinds, generate impressive FCF, and gradually evolve into a revenue growth story. We move to the sidelines because there is now uncertainty on commercial execution and the profitability outlook is disappointing**. We no longer have a clear line of sight into when these headwinds will abate. We downgrade from Buy to Neutral. We find the current valuation reasonable on both a P/E and an EV/Sales basis given the near-term revenue decline, potential lack of mid-term sales growth, and significant cut to profitability.
>
> More on our downgrade: We were constructive on EMBC's efforts to transform into a broad-based medical supplies company. **Now, the company's core business appears increasingly challenged, particularly in the U.S. While we saw EMBC as a value story that is focused on generating cash, paying down debt, and returning cash to shareholders via a quarterly dividend, now the reduced profitability and revised capital allocation priorities, along with the pressured core business, undermine our original thesis.** With

limited visibility into when fundamentals might improve, we cannot point to near-term catalysts for re-rating.[3]

22. In sum, throughout the Class Period, Defendants concealed Walgreens share losses and the deterioration of Embecta's relationship with one of the largest sellers of its pen needles, despite the materiality of those developments to the 2026 Guidance, the Strategic Plan, the dividend, and investors. As a result of Defendants' fraud, investors suffered massive losses.

## II. JURISDICTION AND VENUE

23. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

25. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged violations of the securities laws or their effects have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false

---

[3] *See* Marie Thibault, *Embecta Corporation: Major Miss and Guidance Cut; Capital Allocation Plans Deprioritize Dividend in Favor of Share Buyback; Downgrading to Neutral*, BTIG at 1 (May 5, 2026).

and/or misleading information, occurred in substantial part in this Judicial District. In addition, Embecta's principal executive offices are located in this District.

26. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Plaintiffs

27. Lead Plaintiff John Watson, as set forth in the certification previously filed with the Court (ECF No. 6) and incorporated by reference herein, purchased Embecta stock during the Class Period and suffered damages as a result of Defendants' federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

28. Additional Plaintiff Harrison Apitz-Grossman, as set forth in the certification previously filed with the Court (ECF No. 1) and incorporated by reference herein, purchased Embecta stock during the Class Period and suffered damages as a result of Defendants' federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

29. Defendant Embecta is incorporated under the laws of Delaware, with its principal executive offices located in Parsippany, New Jersey. Embecta's

common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the symbol "EMBC."

30. Defendant Devdatt Kurdikar joined Becton Dickinson in 2021, prior to Embecta's spinoff, to lead its diabetes care business, and has served as Embecta's President and CEO and a member of Embecta's Board of Directors (the "Board") at all times since Embecta's spinoff from Becton Dickinson in April 2022. On or about February 11, 2026, Kurdikar was appointed Chair of Embecta's Board.

31. Defendant Jacob P. Elguicze joined Becton Dickinson in 2021, prior to Embecta's spinoff, and has served as Embecta's CFO at all times since Embecta's spinoff from Becton Dickinson in April 2022.

32. Defendants Kurdikar and Elguicze are referred to herein as the "Individual Defendants."

33. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

34. Because of their positions and access to material non-public information, the Individual Defendants knew, or were reckless in disregarding, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements and omissions of facts pleaded herein, as well as others that may be revealed as such with the benefit of further investigation and discovery.

## IV. FACTUAL BACKGROUND

### A. Embecta's History and Operations

35. Becton Dickinson established Embecta on April 1, 2022, via spinoff of its diabetes care business. Becton Dickinson pioneered insulin-based diabetes care with its 1924 introduction of the first dedicated insulin syringe and thereafter became a market-leading provider of diabetes care products.

36. Embecta's principal products include:

A. pen needles (sterile, single-use medical devices, used with pen injectors that inject insulin or other medications), which generated fiscal year 2025 revenues of $784.1 million (72.6% of Embecta's total revenues of $1.080 billion);

B. sterile, single-use insulin syringes (used to inject insulin drawn from vials), which generated $124.6 million in fiscal year 2025 revenues (11.5% of Embecta's total); and

C. "safety" versions of both pen needles and syringes, which incorporate protective shielding mechanisms to protect users (such as healthcare workers) from needlestick exposure/injury, which generated $137.8 million in fiscal year 2025 revenues (12.8% of Embecta's total).

37. Embecta also generated revenues from the manufacture and sale of "other" products, principally alcohol swabs used in conjunction with insulin injections. During fiscal 2025, Embecta generated $14.0 million in such "other" revenues.

38. Embecta is the leading global supplier of (i) pen needles (with approximately 50% market share); (ii) syringes (with approximately 40% market share); and (iii) safety pen needles and syringes (with approximately 60% market share). In the aggregate, Embecta manufactures more than 8 billion of these products annually.[4]

---

[4] *Analyst & Investor Day Presentation*, Embecta at 7–8 (May 22, 2025), https://investors.embecta.com/static-files/e9b79ba1-418b-43ca-8934-c308395d3437.

39. Embecta sells these products in more than 100 countries, with U.S. sales comprising 54% of total revenues, sales in other developed markets (*e.g.*, Western Europe) comprising approximately 29% of total revenues, and sales from other countries (termed "emerging markets") accounting for approximately 17% of total revenues.

40. In the U.S. and other developed markets, diabetes care is largely a "mature" market, where the legacy insulin delivery products that Embecta supplies offer little prospect for growth (and, in the case of syringes, prospects for substantial declines). In these markets, recent growth in diabetes care has been concentrated in new and more convenient delivery technologies, such as automated insulin delivery ("AID") systems and insulin pumps. Emerging markets offer some growth potential for Embecta's core products because they have large populations of untreated or undiagnosed diabetics and little near-term prospect of adopting AID systems or insulin pumps. But emerging markets are also marked by sharp price competition and lower-cost products.

**B. Embecta's Pricing Strategy and Dynamics**

41. Historically, Embecta has positioned its products as "premium" products and sought to price them at "premium" levels. As Elguicze explained, "we

tend to be a more premium featured product [and] as a result of that, have historically been able to kind of price our products at a premium."[5]

42. As further detailed herein (*see* Section IV.F.3, *infra*), in the U.S., Embecta seeks to compete on price, despite its high list prices, by relying on contractual provisions with its customers that partially offset the high up-front prices Embecta seeks to maintain (*e.g.*, illustratively, $5 per unit), with contingent "back-end" rebates that Embecta pays back to the customer *post facto* in the event the customer meets specified sales volumes (*e.g.*, rebates of $0.50 per unit if 1 million sold, or $1.00 per unit if 10 million sold).

43. As detailed in Section IV.F.3, *infra*: (i) such opaque rebates were a core component of the "Traditional Pricing" model for medical products, which incentivized the medical suppliers' customers to favor and distribute the suppliers' higher-priced products to end users, by providing those customers with rebates to lower the acquisition costs *for them*); and (ii) many market participants, including Walgreens, were abandoning the Traditional Pricing model for newer models that eliminated such back-end rebating, and its associated price opacity, in favor of transparent, up-front price discounting (referred to herein as "Transparent Pricing" procurement models).

---

[5] *See* Elguicze's remarks at the Jefferies Global Healthcare Conference, Bloomberg Tr. at 5 (June 5, 2025).

44. In early 2025, Defendants explained that (i) while they had expected U.S. product pricing to be a "headwind" for Embecta in fiscal year 2025, because – as reported by Wolfe Research in its "transcript-like recap" of Kurdikar's remarks – Embecta "had to give incremental rebates to a couple major players in effort to enter longer term contracts," (ii) they expected U.S. pricing to become a positive "tailwind" for Embecta in fiscal 2026 and following years.[6]

45. By mid-2025, however, Defendants provided a slightly more conservative view: namely, that they projected U.S. pen needle and safety product pricing to "remain relatively flat" in fiscal year 2026 and following years. For example, as Elguicze explained in June 10, 2025 remarks:

> We took the approach that our products tend to be higher-priced products. For purposes of the multiyear LRP, **we did not factor in an ability to continue to try and drive increased price**. Now obviously we'll do our best to try and increase list prices.
>
> But **the underlying base case assumption was that pricing in sort of the pen needle and safety products would remain relatively flat** as was the case in terms of volumes, largely seeing a slightly lower growth rate, if you will, internationally. **And again that could very well prove to be somewhat conservative**.

---

[6] *See* Michael K. Polark, *EMBC: Price Feels Too Punitive – Advocates for a Swing Here (Valuation Therapy & NDR Notes),* Wolfe Research at 7 (Apr. 2, 2025). *See also*, Kurdikar's remarks at the Wells Fargo Healthcare Conference, Bloomberg Tr. at 3 (Sept. 4, 2025) ("I would say certainly look, historically, pricing has been a tailwind for the U.S. **This year, in fiscal 2025, at the beginning of the year, we said, look, it might be a headwind as we were re-upping some large contracts. But as the year has gone by, we've seen that pricing in the U.S. has been maybe a little bit better than we had thought** this year.").

Goldman Sachs 46th Annual Global Healthcare Conference, Bloomberg Tr. at 5 (June 10, 2025).

### C. Embecta's Strategic Plan

46. On May 22, 2025, Defendants held Embecta's inaugural Analyst and Investor Day in New York City (the "Analyst Day"), where Embecta senior management made presentations on various aspects of Embecta's operations (*e.g.*, U.S. business, international business, manufacturing and supply chain, financial results and planning) and, in particular, on Embecta's past, present, and future strategy (the last of which Defendants referred to as Embecta's "long range financial plan" or "LRP," and collectively referred to herein as Defendants' "Strategic Plan").

47. In connection with the Analyst Day, Defendants *inter alia*: (i) webcast in real time all the Analyst Day management presentations (transcripts of which are available on various specialized financial reporting platforms, such as Bloomberg); (ii) filed a May 22, 2025 Form 8-K with the SEC, which attached copies of the slide presentations used by Embecta management on Analyst Day; and (iii) issued a May 22, 2025 press release setting forth the main tenets of Embecta's Strategic Plan. As Defendants explained in Embecta's May 22, 2025 press release, Defendants' Strategic Plan was a "roadmap for transitioning Embecta to growth:"

> Embecta Corp. ("embecta"; "The Company") (Nasdaq: EMBC), a global diabetes care company with a 100-year legacy in insulin delivery, will host its inaugural Analyst and Investor Day today to

> showcase its phased approach for value creation and present its long range financial plan ("LRP").
>
> "Our Investor Day will provide a comprehensive view of our roadmap for transitioning embecta to growth. We look forward to sharing how we are positioning embecta for long-term success in an evolving healthcare landscape," said Dev Kurdikar, President and Chief Executive Officer. "Today, we reiterate our commitment to maintaining our leadership in insulin injection while outlining our long term vision to transform embecta into a more broad-based medical supplies company, paving the way toward a life unlimited for all."

Embecta May 22, 2025 Press Release at 1.

48. As Defendants explained during Embecta's Analyst Day, Embecta's Strategic Plan was comprised of three "phases" – each detailed further below – including: (i) an initial "Stand Up" phase (which Embecta had just completed); (ii) a middle "Seed Growth" phase (where Embecta now was); and (iii) an ultimate "Transform" phase (where Defendants projected Embecta to be following execution of the Strategic Plan):



Analyst Day Presentation at 14.

49. In Phase 1 (the "Stand Up" phase) of Defendants' Strategic Plan, which stretched from 2022 through fiscal 2025 and which Embecta had just completed, Embecta's principal focus was to develop all necessary internal systems and capabilities to operate as an independent company following its spinoff from Becton Dickinson (including, notably, a new enterprise resource planning ("ERP") system– *i.e.*, an integrated software platform that connected all of the business's core daily operations, such as finance, human resources, manufacturing, supply chain, sales, *etc.*). During this phase, Embecta would and did incur very substantial, but non-recurring "stand up" costs.

50. In Phase 2 (the "Seed Growth" phase), where Embecta now found itself, and which Defendants envisioned would stretch from 2025 to approximately 2028, Embecta would focus on three "strategic priorities": (i) maintaining Embecta's core diabetes care business steady, now that its "stand up" costs had passed, to generate substantial, positive free cash flows; (ii) identifying and pursuing *organic* opportunities for marginal near- and mid-term growth, to offset any marginal declines in Embecta's core injection business; and (iii) using the free cash flow generated by the steady core business to fund Embecta's dividend while substantially paying down Embecta's debt and thereby providing Embecta with the "financial flexibility" required for the Strategic Plan's third and final phase –

essentially, "buying growth" via acquisition of a faster-growing business in an adjacent medical supply area. *See* Analyst Day Presentation at 14–15, 59–70 (organic opportunities for marginal growth), 76, 81–83.

51. As Defendants further explained in Embecta's May 22, 2025 press release:

> **Strategic Priorities**
>
> [E]mbecta's core insulin injection business **has long provided a stable, recurring, and geographically diversified revenue base with an attractive margin profile**. Following a successful three-year effort to establish embecta as an independent, standalone organization, the Company is currently focused on three strategic priorities aimed at positioning embecta for sustainable, long-term success:
>
> • Strengthening the core business, which includes executing a seamless brand transition to ensure embecta's identity resonates globally while maintaining the trust of customers. At the same time, the company is continuing to identify opportunities within its core portfolio that bolster its leadership position in injection devices.
>
> • Expanding the Company's product portfolio through the introduction of products that leverage embecta's expertise in high-volume manufacturing and the strength of its global commercial channel.
>
> • Increasing financial flexibility by generating cost savings through operational efficiencies and prioritizing debt reduction, **thereby enhancing the Company's financial agility and ability to make future investments**.

*See* Embecta May 22, 2025 Press Release at 1*; see also id.* at 2.

52. Ultimately, execution of the Strategic Plan was intended to culminate with Phase 3 (the "Transform" phase), in which Embecta would "transition [] to growth" by becoming a "broad based medical supplies company" (rather than just

an "insulin delivery company"). *See* Analyst Day Presentation at 14. Notably, as Defendants explained, Embecta's core diabetes care operations could not themselves provide Embecta with any organic return to growth: instead, the growth prospectively enjoyed by Embecta at Phase 3 could only be achieved *inorganically* – *i.e.*, by *acquiring* a faster-growing business in an adjacent drug delivery/medical supplies area (*e.g.*, "Strategic M&A," "Opportunistic M&A to broaden and diversify portfolio," "pursue strategic opportunities"). *Id.* at 82–83.

53. As Kurdikar summarized during Embecta's Analyst Day:

> . . . We covered a lot of ground in this section. But **the most important thing that I want you to take away is this, we intend, over time, to transition the company into a broader medical supplies company** using our current competencies as a foundation upon which to build. We are working to bolster our foundation and expand the use of our products for GLP-1 delivery. **Beyond that, we want to add products to our portfolio that can help transition the company to growth. As you will hear in the next section, this transition may be potentially sped up with opportunistic M&A once our net leverage has been brought down**.

Analyst Day Conference Call, Bloomberg Tr. at 20 (May 22, 2025).

54. Thus, Embecta's achievement of its Strategic Plan depended on strategic/opportunistic M&A, through which Embecta would, in essence, "buy growth."

55. However, as Defendants explained, Embecta's ability to "buy growth" itself had a precondition: namely, the "financial flexibility" or "balance sheet flexibility" to afford that growth. *See* Analyst Day Presentation at 70, 76, 81, 83.

And as Defendants further explained, that requisite financial "flexibility," in turn, depended on Embecta's ability to at least preserve or maintain its core diabetes business at a steady state in the near to mid-term, in order to generate sufficient free cash flow to pay down Embecta's outstanding debt and fund acquisitions. *Id.* at 70, 76-79, 81-83.

56. Importantly, the Strategic Plan explicitly envisaged a "have your cake and eat it too" scenario in which Embecta, were it to maintain stable revenues from its core injection business, would generate sufficient earnings not only to "buy growth" *via* "strategic M&A," but also to "[m]aintain [Embecta's] dividend at current level[s]":




Analyst Day Presentation at 82.

57. In other words, per the Strategic Plan, if Embecta's revenues remained stable, the resulting earnings would allow it to "buy growth" **while continuing to fund and pay its dividend at current levels**.

58. Elguicze emphasized this point repeatedly in his Analyst Day remarks:

> . . . The achievement of these strategic objectives translates into the following financial targets: a flattish constant currency growth CAGR through fiscal year 2028 and adjusted operating margin of between 28% and 30% in fiscal year 2028. An ability to generate approximately $600 million in cumulative free cash flow through fiscal year 2028, which is defined as cash flow from operations less capital expenditures. And **lastly, the ability to repay between $450 million and $500 million in debt, while keeping our dividend unchanged, resulting in an expected return of capital to shareholders of approximately $107 million during 2026 through 2028**.
>
> ***
>
> . . . Given the significant free cash flow generation, which we expect to generate over the next 3 years, first and foremost, we intend to reduce debt by between $450 million and $500 million, allowing our net leverage levels to reach approximately 2x by the end of fiscal 2028. This is very important to us as it would create a significant amount of balance sheet flexibility moving forward. **Another important piece of our capital allocation framework relates to returning capital to shareholders. And during the LRP time frame, we anticipate maintaining our current level of dividend, which would equate to approximately $107 million in dividends**. Lastly, given the additional balance sheet flexibility that we would envision beginning in 2027 and 2028 time frame, we would look to opportunistically broaden and diversify our product portfolio through M&A.

Analyst Day Conference Call, Bloomberg Tr. at 22-23.

59. Lastly, as Defendants explicitly acknowledged from the outset, the Strategic Plan included as one of its "key assumptions" that Embecta would not experience any "[m]ajor customer loss."




Analyst Day Presentation at 78 (highlighting added for emphasis).

60. Hence, Defendants acknowledged that losing a "major customer" could undermine the Strategic Plan.

**D. Defendants Begin the Class Period With Fiscal 2026 Guidance Appearing to Support Embecta's Strategic Plan**

61. As further detailed in Section V.A.1, *infra*, on November 25, 2025, Defendants reported Embecta's financial results for the fourth quarter and full fiscal year 2025 (ended September 30, 2025) and provided financial guidance for Embecta's forthcoming fiscal year 2026 (ending September 30, 2026). Defendants' 2026 Guidance was comprised of the following:

| **Table 1: 2026 Guidance** | |
|---|---|
| **Metric** | **Guidance** |
| Reported Revenues | $1.071 to $1.093 billion |
| Reported Revenue Growth | (0.9)% to 1.1% |
| Adjusted Constant Currency Revenue Growth | (2.0)% to 0.0% |
| Adjusted Operating Margin | 29.0% to 30.0% |
| Adjusted Earnings per Diluted Share | $2.80 - $3.00 |

62. In short, Defendants' 2026 Guidance was consistent with Defendants' Strategic Plan and indicated that, in fiscal 2026, Embecta would, in effect, "hold the line" by: (i) keeping revenues steady; (ii) thereby allowing the Company to continue to generate substantial earnings and cash flow; which (iii) Defendants could use to continue paying down Embecta's debt and fund its dividend, while enabling Embecta to "buy growth."

63. Analysts reacted positively to Defendants' 2026 Guidance for this exact reason. For example, BTIG analyst Marie Thibault, in a November 25, 2025 report, observed that "[m]anagement also underscored their commitment to achieving the LRP goals set at the Investor Day earlier this year, as reflected by the FY26 guide."[7] Mizuho analyst Anthony Petrone agreed, finding Defendants' 2026 Guidance

[7] *See* Marie Thibault, *Embecta Corporation: Embecta Sticks to Cautious Approach for FY26 Guide; Fast Pace of Debt Paydown and Strong FCF Generation to Continue*, BTIG at 1 (Nov. 25, 2025).

consistent with Embecta's Strategic Plan ("Initial FY26 Guidance in Line with FY26-28 LRP Outlook. . . EMBC provided a detailed outlook for FY26 expectations which we believe represents a solid, albeit potentially conservative start to EMBC's LRP horizon").[8]

### E. Defendants Appear to Advance the Strategic Plan by Acquiring Owen Mumford

64. On March 19, 2026, Embecta announced that it had reached an agreement to acquire Owen Mumford Holdings Limited ("Owen Mumford"), a U.K.-based developer and manufacturer of autoinjectors (among other drug delivery and medical supply devices) for £100 million upfront and up to a further £50 million in future performance-based payments contingent on autoinjector sales volumes.

65. Autoinjectors deliver injectable medicines – such as medications for obesity, auto-immune, and anaphylactic indications – in an easy, user-friendly manner that entails simply placing the handheld device on the body and pushing a button. Driven specifically by fast growth in obesity medication use, as well as ongoing adoption across the injection landscape, autoinjector usage is growing at annual rates well above 10% and is expected to more than double during the next 7

[8] *See* Anthony Petrone, *Embecta Corporation: GLP-1 Pen Needle Boost on Track for FY 2026 to Help Offset Core Erosion: Stay Neutral*, Mizuho at 3 (Nov. 25, 2025).

years (from approximately $12 billion currently to approximately $28 billion in the early 2030s).[9]

66. By providing Embecta an on-ramp to the autoinjector product channel – adjacent in many ways to Embecta's diabetes care business, but larger and faster-growing – the Owen Mumford acquisition appeared to significantly advance Defendants' Strategic Plan.

67. For this reason, analysts following Embecta reacted favorably to the Owen Mumford acquisition. For example, BTIG analyst Marie Thibault concluded that "this transaction checks a lot of boxes" and heralded the deal as "**the first step toward sustainable revenue growth for EMBC**:"

> . . . we note that EMBC offers insulin-administration products while Owen Mumford's offerings are broader. Owen Mumford's business includes both Medical Devices and Pharma Services, with a roughly 60-40 revenue split, respectively. The Pharma Services segment is expected to grow more quickly than Medical Devices over the coming years, driven in part by anticipated adoption of the Aidaptus auto-injector platform. Though we don't have detail on sales growth estimates yet, **we expect this transaction can push EMBC's top-line growth profile into the LSD range over time.** For now, the company is assuming minimal opex synergies and does not expect meaningful capex investments will be required. **We think this transaction checks a lot of boxes: it moves the company into adjacent areas, complements their B2B efforts with generic pharmaceutical partners, and adds the Aidaptus auto-injector platform while not straying from its strengths in manufacturing and scale**. There may be upside from potential geographic expansion of Owen Mumford's

[9] *See* Medical Devices Research Team, *Autoinjectors Market (2026-2033),* Grand View Research (June 2026) https://www.grandviewresearch.com/industry-analysis/auto-injectors-market.

> portfolio and the combination may supplement EMBC's own capabilities on developing a pen injector. **We believe this deal was done at a reasonable valuation and is the first step toward sustainable revenue growth for EMBC.** Importantly, EMBC remains committed to debt paydown and other capital allocation priorities. We like this deal for EMBC. We intend to update our model once the transaction is complete. Reiterate Buy.[10]

**F. Throughout the Class Period, Defendants Are Aware of but Fail to Disclose Either the Risk of Material Share Loss at Walgreens or the Materialization of That Risk**

68. With Defendants' 2026 Guidance indicating that Embecta was fulfilling the near-term elements of its Strategic Plan (namely, maintaining Embecta's core business at a steady run-rate, in order to generate sufficient free cash flow to be able to later "buy growth"), and with the Owen Mumford acquisition indicating that Defendants were on their way to fulfilling the longer-term and ultimate elements of the Strategic Plan (namely, buying growth), investors and the market understood from Defendants' Class Period representations that, literally, everything was going to plan.

69. However, as Defendants knew but concealed from the public until the end of the Class Period, **things were just the opposite. Embecta's core business was materially deteriorating**. At the root of the rot was Embecta's troubled commercial relationship with one of its largest and most important customers,

[10] *See* Marie Thibault, *Embecta Corporation: Putting a Finer Point on EMBC's Announced Buy of Owen Mumford; Our Thoughts on How this Shifts the Co's Profile, Strategy*, BTIG at 1 (Mar. 19, 2026).

Walgreens, which threatened to lead to, and in fact resulted in, Embecta's Strategic Plan falling apart.

### 1. Walgreens, as One of Embecta's Largest and Most Important Customers, Was Material to Embecta's Business

70. At the start of the Class Period, and at all relevant prior times, Embecta's commercial relationship with Walgreens was highly material to Embecta. Walgreens was one of Embecta's largest and most important customers, by itself accounting for approximately 10% of Embecta's gross revenues. Material developments concerning Embecta's business with Walgreens, when disclosed, repeatedly occasioned material movements in Embecta's share price.

71. As Defendants explained during Embecta's Analyst Day, retail pharmacies were a "critical component of our overall success," with "national retailers" (such as Walgreens) comprising the "largest component of our overall retail business" and generating 80% of Embecta's retail channel sales:



Analyst Day Presentation at 28.

72. As specified in Table 2 below, Embecta's quarterly reports filed with the SEC on Form 10-Q stated that, at all times until Embecta's most recently completed fiscal quarter, Embecta had ***three* customers that *each* individually accounted for at least 10% of Embecta's total gross revenues and approximately 40% of Embecta's total revenues in the aggregate**. The 2025 10-K further identified these three large customers as Embecta's "three largest distributors" – specifically, Cencora, McKesson Corporation, and Cardinal Health. *See* Table 2 below; *see also* Embecta Corp., Annual Report (Form 10-K) (Nov. 25, 2025) (hereinafter, "2025 10-K") at 9, 74.

**Table 2:**
**Quarterly Disclosures Regarding Customers Responsible for 10% or More of Gross Revenues**

| Year / Quarter | No. of 10% Customers | Aggregate Share of Embecta's Gross Revenue | Source |
|---|---|---|---|
| Fiscal 2024 | 3 | 41.3% | Dec. 11, 2024 Form 10-K, at 10, 76 |
| 2025 Q1 | 3 | 40.8% | Feb. 6, 2025 Form 10-Q, at 15 |
| 2025 Q2 | 3 | 40.8% | May 9, 2025 Form 10-Q, at 18 |
| 2025 Q3 | 3 | 40.7% | Aug. 8, 2025 Form 10-Q, at 18 |
| Fiscal 2025 | 3 | 41.5% | 2025 Form 10-K, at 9, 74 |
| 2026 Q1 | 3 | 38.1% | Feb. 5, 2026 Form 10-Q, at 17 |
| 2026 Q2 | 3 | 39.1% | May 5, 2026 Form 10-Q, at 19 |
| 2026 Q3 | 2 | 26.0% | Aug. 7, 2026 Form 10-Q, at 21 |

73. However, as Defendants explained and as the above data further demonstrates, Embecta's sales to its three largest distributors – Cencora, McKesson, and Cardinal Health – were substantially a function of and driven by orders from national retail pharmacy chains such as Walgreens.

74. Indeed, after Defendants revealed Embecta's sharp share loss at one such retail pharmacy chain (*i.e.*, Walgreens), the number of 10% customers suddenly dropped from three (as it had been in every prior quarter) to **two**. The disappearance of the third 10%+ distributor, after its steady prior contribution of at least 10% of Embecta's total revenues throughout the two prior years, was substantially underwritten by that distributor having served as the primary link between Embecta products and Walgreens. Specifically, the distributor supplying Walgreens appears to have been Cencora,[11] and after Walgreens cut Embecta's share of pen needle sales in half, Cencora ceased representing 10% or more of Embecta's total revenues and instead became a sub-10% customer.

[11] Pursuant to a long-standing strategic relationship that began in 2013 and extends through at least 2029, Cencora serves as the primary medical product distributor, or "prime vendor," for Walgreens. *See* Cencora, Inc. (f/k/a AmerisourceBergen Corp.), Annual Report (Form 10-K) at 9–10 (Nov. 25, 2014) https://www.sec.gov/Archives/edgar/data/1140859/000104746914009555/a2222308z10-k.htm. This relationship made Walgreens Cencora's largest single customer: during fiscal 2025, Walgreens accounted for 25% of Cencora's total revenues. *See* Cencora, Inc., Annual Report (Form 10-K) at 4, 9 (Nov. 25, 2025), https://www.sec.gov/Archives/edgar/data/1140859/000114085925000131/cor-20250930.htm.

75. As such, Embecta's financial reporting indicates that Walgreens, at all relevant times prior to imposing its severe share reduction on Embecta pen needles, by itself accounted for approximately 10% of Embecta's total revenues.[12]

76. Walgreens' materiality to Embecta is further confirmed by the facts that Walgreens-related developments repeatedly: (i) generated financial impacts on Embecta so sizable as to require Defendants to materially adjust Embecta's financial guidance; and (ii) drove material movements in Embecta's share price.

A. For example, on May 9, 2025, Defendants revised Embecta's fiscal 2025 revenue guidance downwards, due to a large wave of "store closures at a specific U.S. retail pharmacy customer" that

---

[12] Specifically, as Table 2 indicates, the third distributor (the one that supplied Walgreens) appears to have accounted for approximately 14% of Embecta's total revenues (given that three 10%+ distributors had previously generated approximately 40% of Embecta's total revenues, but following Walgreens' share reduction, two 10%+ distributors generated 26.0% of the total). For that distributor, which previously contributed approximately 14.0% of Embecta's total revenues, to become a sub-10% customer, its share of Embecta total revenues would have had to drop from approximately 14.0% to, at best, approximately 9%. In other words, the Walgreens share loss drove sales to that distributor from 14% of total sales to 9% or less of total sales – which, in turn, indicates that the Walgreens share reduction equated to at least 5% of total Embecta sales (*i.e.*, driving its distributor's share of Embecta's total sales from 14% to 9% or less). Finally, given that Embecta's share of Walgreens pen needle sales was effectively halved – from above 90% to below 50% – it can be deduced that Walgreens itself had accounted for at least 10% of Embecta's total revenues (*i.e.*, if a 50% share reduction at Walgreens drove a reduction of at least 5% in total Embecta revenues, then total Walgreens sales of Embecta pen needles must have previously accounted for at least 10% of Embecta's total revenues).

would reduce near-term orders for Embecta products.[13] Wolfe Research analysts stated that they "suspect it is Walgreens," noting that "Walgreens plans to close 1,200 stores over the next three years."[14] In response to this news (of decreased near-term orders from Walgreens, and the depressing impact of the same on Embecta's fiscal 2025 revenues), Embecta's shares lost 10% of their value in a single day, falling from their May 8, 2025 closing price of $13.30 per share to close trading on May 9, 2025 at $11.97 per share.

B. Likewise, on May 5, 2026, when Defendants revealed Embecta's sharp share losses at Walgreens, and as a result, materially reduced their 2026 Guidance and effectively eliminated Embecta's dividend, Embecta shares lost 57.8% of their value in a single day, falling from their May 4, 2026 closing price of $9.25 per share to close trading on May 5, 2026 at $3.90 per share.

---

[13] As Defendants explained during Embecta's conference call with analysts and investors on May 9, 2025. *See* Q2 2025 Conference Call, Bloomberg Tr. at 2, 5, 7, 11 (May 9, 2025).

[14] *See e.g.* Mike Polark, *EMBC: Not Perfect But EPS Defended &…checks notes…4x P/E Doesn't Require Perfect (FY2Q25 Review)*, Wolfe Research at 1 (May 9, 2025).

### 2. Following Private Equity's Acquisition of Walgreens in Mid-2025, Walgreens' Management Promises Renewed Focus on Operational Discipline

77. On March 6, 2025, Walgreens announced that it had agreed to be acquired and "taken private" by private equity firm Sycamore Partners ("Sycamore"). On August 28, 2025, Sycamore and Walgreens announced that the former's acquisition of the latter had been completed.[15]

78. Upon taking control of Walgreens, Sycamore installed Mike Motz as Walgreens' new CEO and promised to bring "significant operational discipline" to Walgreens. *Id.*

79. As is often the case when private equity gains control over a company, efforts to impose such "operational discipline" often entail review and reexamination of the company's suppliers. Indeed, following Sycamore's acquisition of Walgreens, Cencora – whose strategic and contractual relationship with Walgreens had made Cencora Walgreens' primary medical products vendor, and Walgreens Cencora's largest customer (*see* ¶ 74 n. 11, *supra*) – warned its own investors that

---

[15] *See* Press Release, Walgreens, *Walgreen Co. to Operate as Private Standalone Company Following Acquisition By Sycamore Partners* (Aug. 28, 2025), https://corporate.walgreens.com/news-and-stories/press-releases/2025/walgreen-co-to-operate-as-private-standalone-company-followingacquisition-by-sycamore-partners/.

Walgreens' "new owners may seek changes to [Walgreens'] operations or our relationship with [Walgreens] that could affect our agreements with Walgreens."[16]

### 3. Walgreens Revises Its Pharmacy Procurement to Privilege Up-Front Discounts Over Contingent, Back-End Volume-Based Discounts

80. Until recently, medical products were priced and distributed through a complex system that allowed higher-priced products and/or higher prices to be propagated throughout the medical products ecosystem by coupling (i) high manufacturer list prices – *i.e.*, the **upfront** costs to acquire the medical products – with (ii) complex contractual mechanisms providing *post facto* rebate payments, typically tied to achieving pre-specified levels of product sales (*i.e.*, the "Traditional Pricing" system). The Traditional Pricing system's reliance on contingent, back-end rebating, which functioned as *post facto* discounting for the customer in question, introduced substantial opacities and distortions into the medical product supply system. For example, the customer receiving back-end, volume-based rebates could be incentivized to select and promote ultimately higher-priced items, which it could acquire at lower prices and re-sell at substantially higher prices (*e.g.*, manufacturer list prices).

81. Embecta relied on exactly such contractual mechanisms, in which higher up-front product costs (consistent with Embecta's positioning as a "premium"

---

[16] *See* Cencora Form 10-K, *supra* n. 11, at 9.

product provider maintaining "premium" pricing levels) could be partially offset via various contingent, back-end, volume-based rebates. Indeed, as Embecta explained in each of its quarterly and annual SEC filings, reliance on back-end rebating subjected Embecta's gross revenues "to a variety of deductions, which include rebates" that had to be estimated prospectively before their ultimate back-end concretization:

> Revenue Recognition
>
> Our revenues are primarily recognized when the customer obtains control of the product sold, which is generally upon shipment or delivery, depending on the delivery terms specified in the distribution or sales agreement. **Our gross revenues are subject to a variety of deductions, which include rebates**, chargebacks, sales discounts and sales returns. **These deductions represent estimates of the related obligations, and judgment is required when determining the impact of these revenue deductions on gross revenues for a reporting period. Rebates are based upon prices determined under our agreements with the end-user customers**. Additional factors considered in the estimate of our rebate liability include the quantification of inventory that is either in stock at or in transit to our distributors, as well as the estimated lag time between the sale of product and the payment of corresponding rebates.

2025 10-K at 42.

82. However, the pricing opacity in the Traditional Pricing procurement system, and associated pricing abuses enabled by this opacity, have recently galvanized commercial and regulatory pressure in favor of more transparent (and less abusive) pricing systems. While multiple such systems have been developed and pursued, all seek to enable more transparent and less distortive pricing by

abandoning opaque, *post facto* rebating schemes and relying instead on transparent, up-front discounting (referred to herein as "Transparent Pricing" systems).

83. One prominent example of such Transparent Pricing systems is the so-called "cost-plus" pharmacy pricing model, pursuant to which a medical product's final price is transparently and straightforwardly determined by adding, to the product's **actual** acquisition cost (itself a product of transparent, up-front discounting rather than *post facto* rebating), a standard markup (*e.g.*, 15%), plus flat fees for dispensing (*e.g.*, $5 for pharmacy labor) and shipping (*e.g.*, $5 for home delivery).

84. Walgreens and other large national pharmacy chains, like CVS, have long espoused their support for a cost-plus model and disclosed their increasing transition to that model in their contracts. For example, as early as January 2024, Walgreens disclosed its intention to rework the pricing terms of its contracts with payers and pharmacy benefit managers (which determine Walgreens' reimbursement for dispensing products, such as Embecta's pen needles).[17]

85. As reported in the Fierce Healthcare article, the then "CEO of Walgreens, Tim Wentworth signaled the drugstore retail giant is exploring new

[17] *See* Heather Landi, *New Walgreens CEO signals pharmacy giant will shift to new drug pricing models,* Fierce Healthcare (Jan. 5, 2024), https://www.fiercehealthcare.com/providers/new-walgreens-ceo-signals-pharmacy-giant-will-shift-new-drug-pricing-models.

pharmacy models as cost-plus drug pricing gains momentum." The article further explained that Wentworth's "comments come as both CVS and Walgreens recently announced new programs designed to reduce prescription drug prices for many patients and bring greater price transparency to consumers." According to the article, Wentworth "said he sees momentum toward 'cost plus' models" and "expects to see payment model changes in the next year or two, he told analysts. 'We are prepared and already have sat down and had conversations to support these models, and we could convert to a cost-plus model overnight. We are a willing player in terms of what we would need to do to compete and win patients on a cost-plus basis,' he said." *Id.*

Similarly, a January 10, 2025 article entitled *Walgreens makes progress on turnaround in Q1, though losses grow*, published in Healthcare Dive, reported that Walgreens was leveraging its substantial presence in the retail pharmacy space to renegotiate the payment structure of its contracts to "give Walgreens' pharmacies more stable reimbursement." The article noted that such comments from Walgreens' then-CEO Tim Wentworth "follow similar news from Walgreens competitor CVS Health earlier this week that it had transitioned commercial pharmacy contracts to a more reliable 'cost plus' model. 'If you think about what they announced, it's very

similar. It's a different way of I guess thinking about what we've been doing in our contracts,' Wentworth said."[18]

#### 4. Even Prior to the Class Period, Embecta Begins Losing Walgreens Share to Lower-Priced Competitor HTL-Strefa

86. At all relevant times prior to approximately December 2025, Embecta was installed as Walgreens' "preferred" provider of pen needles and syringes, and as such, monopolized the lion's share of Walgreens' sales of those products. During these times, Embecta's share at Walgreens exceeded 90%.

87. However, by early 2025, Embecta saw that its share at Walgreens had begun to fall (while still remaining above 90%). Embecta learned that its initial (but still-marginal) share losses at Walgreens were driven by Walgreens' embrace of a new, lower-priced provider of pen needle and syringe products: HTL-Strefa.

88. HTL-Strefa, Inc. ("HTL-Strefa"), with U.S. offices in Holmdel, New Jersey, and Woodstock, Georgia, is the name under which the MTD Group ("MTD") operates in North America.[19] MTD, headquartered in Italy and with manufacturing facilities in Italy and Poland, is the world's second-largest producer of pen needles

---

[18] *See* Rebecca P. Parduhn, *Walgreens makes progress on turnaround in Q1, though losses grow,* Healthcare Dive (Jan. 10, 2025), https://www.healthcaredive.com/news/walgreens-q1-2025-pharmacy-turnaround/737003/.

[19] *See North America*, HTL-Strefa, https://mtdglobal.com/north-america/ (last visited Oct. 22, 2026).

(after Embecta). HTL-Strefa markets its pen needles in North America under the brand name "Droplet." Droplet is the fastest-growing pen needle brand in North America.[20] During 2025, Droplet was winning payer coverage. For example, California's Medicaid pharmacy program (Medi-Cal Rx) added Droplet to its contracted pen-needle list, alongside Embecta, effective July 1, 2025.[21]

89. Behind Droplet pen needles' market-leading growth are two related facts. First, HTL-Strefa prices Droplet pen needles far below Embecta's prices; at comparable specifications, Droplet pen needles retail for approximately $0.08–$0.15 per unit, versus approximately $0.30-$1.00 for Embecta's – a discount of roughly 50 to 90%.[22] Second, HTL-Strefa delivers that pricing through up-front discounts,

---

[20] *Id.*; *see also* Press Release, HTL-Strefa, *HTL-Strefa Responds to Growing Calls for Affordable Healthcare With Cost-Effective Diabetes Solution* (Oct. 4, 2024), https://www.newswire.com/news/htl-strefa-responds-to-growing-calls-for-affordable-healthcare-with-22436586 (citing "IQVIA Manufacturer Volume Trend" data).

[21] *See* Notice, Medi-Cal Rx, *Medical Supplies: Updates to the List of Contracted Pen Needles, Effective July 1, 2025* (June 1, 2025), https://medi-calrx.dhcs.ca.gov/cms/medicalrx/static-assets/documents/provider/news/2025.06_A_Updates_Contracted_Pen_Needles.pdf.

[22] For example, a box of 90 Embecta pen needles (32G, 4mm) retails on the Diabetics Essentials website at $28.02 (representing a unit price of $0.31 per pen needle), while a box of 100 Droplet pen needles (32G, 4mm) retails on the same site at $12.51 (a unit price of $0.13 per pen needle). *See Embecta Ultra-Fine Pen Needles*, Diabetics Essentials, https://diabeticsessentials.com/collections/insulin-pen-needles/products/becton-dickinson-ultra-fine-pen-needles-bd?variant=47277697630431 (last visited Oct. 22, 2026) and *HTL-Strefa Droplet Pen Needles*, Diabetics Essentials,

consistent with the Transparent Pricing model that Walgreens was adopting, rather than through back-end rebating mechanisms upon which the Traditional Pricing model and Embecta's premium pricing depended.

90. Lower pricing and up-front discounting made Droplet a natural fit for Walgreens and a growing threat to Embecta's share there.

### 5. Embecta Seeks to Defend Its Walgreens Share With Price Concessions That Remain Dependent on Contingent Back-End Rebating and Come as 'Too Little, Too Late'

91. Embecta saw the share erosion at Walgreens and understood the threat Droplet posed in real time and thereafter sought to defend its Walgreens share by extending further pricing concessions to Walgreens. As Embecta's own disclosures confirm, such concessions continued into the fourth quarter of fiscal 2025 (*i.e.*, the three months ended September 30, 2025).

92. On November 25, 2025, Kurdikar disclosed that U.S. pricing in the fourth quarter of fiscal 2025 had been "unfavorable by approximately $7 million, primarily due to milestone payments made to a large U.S. pharmacy customer" – namely, Walgreens.[23]

---

https://diabeticsessentials.com/collections/insulin-pen-needles/products/htl-strefa-droplet-pen-needles?variant=47277696057567 (last visited Oct. 22, 2026).

[23] Although Kurdikar did not then identify that "large U.S. pharmacy customer" by name, subsequent disclosures make clear that it was Walgreens. For example, nearly six months later, after Defendants had revealed sharp share loss at a "single customer," Kurdikar was asked on May 5, 2026 whether the customer Embecta had lost share with was "the same customer as was referenced last quarter, where there

93. The concessions did not hold Walgreens' business. By mid-December 2025, Walgreens had made HTL-Strefa its preferred pen needle supplier, causing Embecta's share of Walgreens' pen needle business to fall from above 90% to below 50%.

94. The concessions failed for two reasons. First, Embecta delivered them through the *post facto* rebating mechanisms, which Walgreens had abandoned in favor of Transparent Pricing models. Second, they were too little and too late. Embecta's rebates could not match the up-front discounts HTL-Strefa offered on Droplet.

95. Kurdikar effectively confirmed this shortly after the Class Period. In virtual investor meetings hosted by BTIG during the week following May 4, 2026, Kurdikar and Embecta's head of investor relations provided further details concerning the commercial dynamics at the large, single customer in question. As BTIG reported:

> The large customer has reportedly shifted its strategy across the board, prioritizing products (even beyond EMBC's product categories) with lower upfront acquisition costs instead of using rebates. The share loss at this large customer was meaningful and rapid. . . While EMBC previously held majority share at this customer, it is now a few points below a lower-cost competitor that has taken the lead spot. . . Management is evaluating its options to compete more effectively

---

were pricing concessions made." Kurdikar confirmed that "it was the same customer," and that the share loss there was "a little bit deeper than we anticipated." *See* ¶¶ 188-92, *infra*. A J.P. Morgan analyst later identified that customer as Walgreens. *See* ¶ 109, *infra*.

while protecting pricing."[24]

96. Mizuho likewise reported that Embecta had suffered "a -50% share reduction across one key US retail channel."[25]

### 6. No Later Than December 2025, Walgreens Displaces Embecta and Installs HTL-Strefa as Its Preferred Provider of Pen Needles and Syringes

97. As a result of the foregoing, Walgreens, no later than mid-December 2025, decided to replace Embecta with HTL-Strefa as its "preferred provider" of pen needles and syringes.

98. Walgreens communicated this directive to and throughout Walgreens' nationwide network of pharmacies *via* a December 2025 communication posted on Walgreens' internal Compass communication system, titled "Droplet Pen Needles and Syringes are Walgreens' Preferred Brand for Filling Prescriptions."[26]

---

[24] *See* Marie Thibault, *Management Meeting Highlights: Evaluating Ways to Combat U.S. Headwinds But Visibility Is Limited For Now*, BTIG at 1 (May 11, 2026).

[25] *See* Anthony Petrone, *US Pen Needle Collapse Triggers Reset With Outlook For Turnaround Unclear: Cut PT to $5*, Mizuho at 1 (May 6, 2026).

[26] As revealed in a bulletin board discussion among Walgreens store managers concerning procedures for ordering insulin syringes. *See Insulin syringes*, REDDIT (r/WalgreensPharmacy) (Jan. 7, 2026, 6:07 PM), https://www.reddit.com/r/WalgreensPharmacy/comments/1q6uubl/insulin_syringes/. Specifically, in that discussion, one user (under the moniker AdPlayful2692), in a January 7, 2026 post made at 6:12 PM EST, noted that the "Company wants you to use Droplet. **There was a compass message a few weeks ago** with all the NDCs of what was preferred." *Id.* ("NDCs" are National Drug Codes: unique numerical identifiers for prescription and over-the-counter drug product and medical devices; "compass" refers to Walgreens' Compass system – an internal corporate

99. Embecta's share of Walgreens' pen needle and syringe business thereafter sharply plummeted, falling from above 90% to below 50% and trailing HTL-Strefa's now-leading share of Walgreens' business.

### G. Throughout the Class Period, Defendants Knew but Omitted to Disclose That the Sole, FDA-Qualified Supplier of the Active Ingredient Used in Embecta's Alcohol Swab Product Line Had Exited the Market, Forcing the Discontinuation of That Entire Line of Products

100. As set forth above, aside from pen needles and syringes, Embecta also manufactures and distributes certain other adjacent products: principally, alcohol swabs employed for sterilization purposes in connection with diabetes injections. *See* ¶ 37, *supra*.

101. However, as Defendants admitted only after the Class Period, in "late 2025" the sole supplier of the active ingredient in Embecta's alcohol swabs

---

communication and task-management board used by Walgreens' store leadership to receive company directives, updates, and daily operational instructions, which serves as a central hub for corporate notes, product and pharmacy recalls, and new program or policy rollouts). A second user (under the moniker SolotravelSC) confirmed this directive, adding in a 7:26 PM comment the same day that "[m]y understanding was [that it] was only for pen needles not for regular syringes." *Id.* Ten minutes later, at 7:36 PM, the first user (AdPlayful2692) clarified that the directive applied to both pen needles and syringes ("It's both. The topic is listed in Compass as: **'Droplet Pen Needles and Syringes are Walgreens' Preferred Brand for Filling Prescriptions.'** There's a conversion attachment for both pen needles and syringes"). *Id.* The above-detailed messages were written and posted on January 7, 2026 and described the directive to have been issued via Compass "a few weeks ago," indicating that the Walgreens directive was communicated via Compass in mid-December 2025.

discontinued that business line. Because Embecta was unable to find an FDA-approved alternative supplier, the exit of Embecta's sole supplier forced the discontinuation of Embecta's alcohol swab product line.

102. Notwithstanding Defendants' late-2025 knowledge of the sole supplier exit and the resulting, forced discontinuation of Embecta's alcohol swab product, Defendants omitted to disclose these facts throughout the Class Period, and instead only belatedly revealed them in post-Class Period disclosures on May 5 and 13, 2026.

### H. Defendants' Belated May 5, 2026 Disclosures Reveal Material Deterioration in Embecta's Core Business That Invalidates the 2026 Guidance and Threatens to Scupper the Strategic Plan

103. On May 5, 2026, Defendants: (i) reported Embecta's financial results of operations for the second quarter of fiscal 2026, ended March 31, 2026 ("Q2 2026"); (ii) issued a press release setting forth Q2 2026 results and further discussing Embecta's operations, performance, and strategy (the "Q2 2026 Press Release"); (iii) filed a quarterly report on Form 10-Q with the SEC for the same period (the "Q2 2026 10-Q"); and (iv) hosted a conference call with analysts and investors to further discuss Embecta's operations and financial performance (the "Q2 2026 Conference Call").

104. In these disclosures, Defendants revealed, as further detailed below, that: (i) Q2 2026 financial results had fallen "significantly below [] expectations,"

driven by sharp declines in U.S. revenues caused in large part by a severe share loss at one of Embecta's largest customers (Walgreens); (ii) due to the same causes, fiscal 2026 results would fall materially short of Defendants' 2026 Guidance, which Defendants now replaced with new, materially reduced revenues and earnings guidance; and (iii) due to the same causes, Defendants would effectively eliminate Embecta's quarterly common stock dividend, reducing it from quarterly payments of $0.15 per share to quarterly payments of $0.01 per share.

105. Specifically:

A. Embecta's financial results for Q2 2026 included reported revenues of $221.8 million (a decline of 17.4% on an adjusted constant currency basis from the year-ago quarter), driven by an astounding 29.4% decrease in U.S. revenues, which resulted in a concomitant deterioration in Embecta's margins and earnings.[27]

B. Defendants' new financial guidance reductions for fiscal year 2026 envisioned revenues approximately $90 million below the

[27] Specifically: adjusted operating income and margin of $48.6 million and 21.9% (versus $81.4 million and 31.4% in the year-ago quarter); adjusted net income and adjusted earnings per diluted share of $16.1 million and $0.27 (versus $40.7 million and $0.70 in the year-ago quarter); and a net loss and loss per diluted share of $(4.1) million and $(0.07) (versus net income of $23.5 million and earnings per diluted share of $0.40 in the year-ago quarter).

figures provided in the 2026 Guidance, as indicated in the comparison table below.[28]

| Table 3: Reductions To Fiscal Year 2026 Guidance | | |
|---|---|---|
| **Metric** | **Initial 2026 Guidance** | **Reduced Guidance** |
| Reported Revenues | $1.071 to $1.093 billion | $1.015 to $1.035 billion |
| Reported Revenue Growth | (0.9)% to 1.1% | (6.1)% to (4.2)% |
| Adjusted (Organic) Constant Currency Revenue Growth | (2.0)% to 0.0% | (10.2)% to (8.3)% |
| Adjusted Operating Margin | 29.0% to 30.0% | 22.25% to 23.25% |
| Adjusted Earnings per Diluted Share | $2.80 to $3.00 | $1.55 to $1.75 |

106. Kurdikar began the Q2 2026 Conference Call by explaining the factors underlying Embecta's Q2 2026 and 2026 Guidance shortfalls. Kurdikar stated that the "largest contributor to the lower year-over-year U.S. revenue" (and hence, to Q2 2026 and 2026 Guidance shortfalls) was "share loss within our pen-needle product category, **most of which is concentrated at a single customer**," while identifying

[28] For the avoidance of doubt, as Defendants explained in their May 5, 2026 disclosures, Defendants reduced *organic* fiscal 2026 revenue guidance by approximately $90 million (equating to an approximately 8.2% reduction), which was partially offset by $30 million of additional revenues that Embecta would gain during the remainder of fiscal 2026 from Owen Mumford's former operations (following the close of the Owen Mumford acquisition in mid-May 2026). For this reason, the apparent fiscal 2026 guidance reductions on a "reported" basis (approximately $57 million, or 5.3%) understated the actual 2026 guidance reduction and the extent of the impairment to Embecta's core, non-Owen Mumford business (approximately $90 million, or 8.2%).

"overall market volume softness for insulin pens and pen needles" and Embecta's "decision to discontinue our swab products" as secondary and tertiary factors:

> Good morning, everyone, and thank you for joining us today. I want to start the call by addressing our second quarter performance and full-year guidance revision. **This was a difficult quarter for Embecta. Our results were below expectations, with consolidated revenues down 14.4% year-over-year on an as-reported basis, or 17.4% on an adjusted constant currency basis.**
>
> **As a result, we are updating our full-year guidance to account for the underlying factors that impacted performance during the quarter, and that we expect to persist for the remainder of the year**. . .
>
> Turning to the second quarter, while our international business performed in line with our prior outlook, **our U.S. business fell short of expectations due to a combination of factors that I'm going to take you through now. The largest contributor to the lower year-over-year U.S. revenue is share loss within our pen-needle product category, most of which is concentrated at a single customer**. We estimate that the remainder is spread across smaller regional and independent pharmacy customers.
>
> It is important to understand that the patients switching to competitive products are likely not on payer plans where we have preferred access. That means that the revenue impact of this switching is estimated to be greater than what is indicated by an average unit price. The second largest contributor is overall market volume softness for insulin pens and pen needles in the retail channel. We believe this contributes to most of the remaining pen-needle revenue decline.
>
> ***
>
> Excluding the anticipated four-month contribution from Owen Mumford, our current organic revenue outlook at the midpoint is approximately $995 million or a reduction of approximately $75 million from the low end of our prior expectations. **Pen needles account for approximately 70% of the $75 million revenue guidance reduction or approximately $53 million.** Given that pen

> needle market volume estimates can be somewhat imprecise, it is not possible to exactly calculate the individual contributions of competitive share loss and market volume softness on our product volumes.
>
> **Our estimate is that share loss accounts for nearly half of the pen needle revenue reduction, or approximately $25 million,** while overall market volume softness is estimated to account for approximately $20 million. The remaining pen needle headwinds we are seeing are related to inventory reductions at certain accounts and additional net pricing pressure which together accounts for approximately $8 million of the revenue guidance reduction.
>
> Turning to syringes, they account for approximately $13 million of the remaining $22 million revenue guidance reduction, most of which stems from lower syringe use associated with compounded drugs.
>
> **While our decision to discontinue our swab products accounts for approximately $5 million of the revenue guidance reduction. For context, in late 2025, our sole supplier of the active ingredient in our alcohol swabs exited the API manufacturing space. Despite extensive efforts, we were unable to qualify an alternate supplier under applicable FDA standards, and while we remain committed to supporting our customers and patients through this transition, we recently made the decision to cease production of alcohol swabs. This product line had lower gross margins than our insulin injection devices**.

Q2 2026 Conference Call, Bloomberg Tr. at 2-3 (May 5, 2026).

107. After Kurdikar's prepared initial remarks during the Q2 2026 Conference Call, Defendants entertained questions from analysts following Embecta – which, immediately, focused on the primary driver of the Company's shortfalls: its sharp share loss at one of its largest customers.

108. During the following exchange with BTIG analyst Marie Thibault, Kurdikar, while declining to name the share-loss customer explicitly, acknowledged

that that customer was the same one that Embecta had specifically called out during a prior conference call (specifically, the November 25, 2025 conference call – *see* ¶¶ 132-34, *infra*) and that Embecta had "anticipated" losing share with that customer:

> Q - Marie Thibault [BTIG analyst]
>
> **Good morning. I want to spend a little time better understanding the U.S. weakness this quarter and assumptions going forward. I think you said in your commentary that in the U.S. pen needle segment, the losses were concentrated at a single customer. I wanted to understand if that was the same customer as was referenced last quarter, where there were pricing concessions made, and why, if so, the volumes were not stabilized by that move.** And then secondly, you called out a weakness in insulin pen prescriptions. Can you tell us a little bit more about what's driving that? Could that be short-lived, or is that a long-term trend?
>
> A – Devdatt Kurdikar
>
> Marie, good morning. Let me start by taking the market question first on insulin pens and pen needles, and then go to the competitive loss question . . .
>
> ***
>
> **Now with respect to the competitive loss, *yes it was the same customer that we had referred to earlier*. Obviously, I don't want to talk about pricing at any specific customer or even broadly in the U.S. market *but I think what we've ended up is the share loss at that customer is a little bit deeper than we anticipated*** but I want to point out a couple of factors that I referenced in my prepared remarks.
>
> **So when there is a shift in share at a particular retailer we believe that much of that share loss occurs with patients who are not on preferred plans with us and so they can move to a different brand of pen needles and still use their insurance plan and so when that happens the revenue impact of that share loss is higher** since if we

> are not on a preferred plan for that patient obviously the rebate amount for that payer plan is less for us.
>
> Secondly, while yes, most of that competitive loss was concentrated at the aforementioned account we are seeing some declines in smaller regional players as well as independent pharmacies. Now with these smaller regional players and independent pharmacies, the rebates that these retailers get are obviously less than obviously less than our large customers, and so that has an impact on the revenue as well. And so the competitive share loss affects us, maybe at a higher rate than one might imagine just by using an average unit price. So those are the two factors that are impacting the U.S. results this quarter and drove the majority of the guidance revision for the year.

Q2 2026 Conference Call, Bloomberg Tr. at 8-9.

109. J.P. Morgan analyst Rishi Parekh subsequently issued a research report identifying the customer in question as Walgreens, specifically discussing "the material customer shift during Q2," in the context of discussing the possibility of Embecta "winning back Walgreens."[29]

110. Analysts following Embecta reacted quite negatively to Defendants' May 5, 2026 disclosures, with multiple analysts downgrading their fundamental investment opinions (*e.g.*, from "buy" to "hold," or from "hold" to "sell") and all sharply cutting their price targets.

111. For example, in her May 5, 2026 analyst report on Embecta, BTIG analyst Marie Thibault downgraded Embecta from Buy to Neutral, withdrew her

---

[29] *See* Rishi Parekh, *Embecta Corp: Q3 Better than Expected; FCF Remains Strong; However, Still Early and Challenges Remain; Maintain UW*, J.P. Morgan at 1 (Aug. 10, 2026).

price target, and concluded that Defendants' May 5, 2026 disclosures thoroughly "undermine our original thesis" on Embecta as an investment, explaining that "We were constructive on EMBC's efforts to transform into a broad-based medical supplies company. Now, the company's core business appears increasingly challenged, particularly in the U.S. While we saw EMBC as a value story that is focused on generating cash, paying down debt, and returning cash to shareholders via a quarterly dividend, now the reduced profitability and revised capital allocation priorities, along with the pressured core business, undermine our original thesis."

112. Specifically, Thibault's May 5, 2026 report stated:

> **Major Miss and Guidance Cut; Capital Allocation Plans Deprioritize Dividend in Favor of Share Buyback; Downgrading to Neutral**
>
> **WHAT YOU SHOULD KNOW: We are downgrading our rating on Embecta from Buy to Neutral. Shares are down >50% after a surprisingly weak F2Q print, mainly driven by meaningful U.S. pen needle share loss** and broader U.S. market volume softness. For F2Q, the company reported total revenue of $221.8M and adj. EPS of $0.27, well below consensus of $235.7M and $0.42, respectively. **The full-year sales guide was cut by $57M at the midpoint, even after including the benefit of ~$30M in revenue expected from the Owen Mumford (Private) acquisition** expected to close by the end of this month. The outlook for adj. operating margin was chopped to 22.25-23.25% (prior 29.0-30.0%) and adj. EPS was lowered to $1.55-$1.75 (prior $2.80- $3.00). While International sales of $126.4M (cons. $130.3M) were relatively in line with management expectations, the U.S. business was hit by increased competition and overall weak market volumes, with sales of $95.4M (cons. $130.9M). Management observed lower demand for both pen needles and syringes, particularly in the retail channel, due largely to increased adoption of a low-cost pen needle competitor at a large customer, as well as potential headwinds

> from greater patient access to GLP-1 drugs and expiration of enhanced ACA subsidies. The reduced guidance assumes these issues continue for the rest of FY2026, without further deterioration or improvement.
>
> **In tandem, EMBC cut its quarterly dividend from $0.15/share to $0.01/share. . . EMBC is still generating free cash flow, but this has been diminished to $95M-$105M in anticipated FCF generation for FY26 (prior $180M-$200M)**, which assumes a one-time ~$40M cash use related to the brand transition and Owen Mumford acquisition. **While we had long felt EMBC to be undervalued — shares were recently trading at ~3x NTM EPS prior to the selloff — our prior Buy thesis was predicated on management's demonstrated ability to maneuver through market and macroeconomic headwinds, generate impressive FCF, and gradually evolve into a revenue growth story. We move to the sidelines because there is now uncertainty on commercial execution and the profitability outlook is disappointing. We no longer have a clear line of sight into when these headwinds will abate. We downgrade from Buy to Neutral.** We find the current valuation reasonable on both a P/E and an EV/Sales basis given the near-term revenue decline, potential lack of mid-term sales growth, and significant cut to profitability.
>
> **More on our downgrade**: **We were constructive on EMBC's efforts to transform into a broad-based medical supplies company. Now, the company's core business appears increasingly challenged, particularly in the U.S. While we saw EMBC as a value story that is focused on generating cash, paying down debt, and returning cash to shareholders via a quarterly dividend, now the reduced profitability and revised capital allocation priorities, along with the pressured core business, undermine our original thesis. With limited visibility into when fundamentals might improve, we cannot point to near-term catalysts for re-rating.** [30]

113. In other words, as Thibault observed, Embecta's May 5, 2026 disclosures revealed for the first time that, contrary to Defendants' Class Period

---

[30] *See* Thibault, supra n. 3, at 1.

disclosures, Embecta's Strategic Plan was at risk of collapse – essentially, due to rot in Embecta's core business.

114. For this reason, and in response to Defendants' May 5, 2026 revelations, Embecta shares immediately lost most of their value, plummeting from their prior-day (May 4, 2026) closing price of $9.25 per share to close trading on May 5, 2026 at $3.90 per share – a one-day decline of approximately 57.8%, or $5.35 per share.

## I. Post-Class Period Developments at Embecta Signal That the Company Recognized the Need to Reverse Course

115. On June 16, 2026, Embecta announced that it hired, as its new Senior Vice President and President, North America, Nimish Muzumdar, who would "be responsible for leading the United Status and Canada commercial teams," report directly to Kurdikar, and serve on the Company's Operating Team. In making this announcement, Embecta touted Mr. Muzumdar's "wealth of experience in US retail pharmacy and hospital channels."[31]

116. On August 7, 2026, Defendants: (i) reported Embecta's financial results of operations for the third quarter of fiscal 2026 (the quarter ended June 30, 2026); (ii) issued a press release setting forth Q3 2026 results and further discussing

---

[31] *See* Press Release, Embecta Corp., *Embecta Appoints Nimish Muzumdar as SVP and President, North America* (June 16, 2026), https://investors.embecta.com/news-releases/news-release-details/embecta-appoints-nimish-muzumdar-svp-and-president-north-america.

Embecta's operations, performance, and strategy (the "Q3 2026 Press Release"); (iii) filed a quarterly report on Form 10-Q with the SEC for the same period (the "Q3 2026 10-Q"); and (iv) hosted a conference call with analysts and investors to further discuss Embecta's operations and financial performance (the "Q3 2026 Conference Call").

117. Defendants' August 7, 2026 disclosures indicated that Embecta, in sharp contrast to prior quarters, had belatedly lowered its pricing in order to defend its sales volumes. Although once again reporting sharp declines in U.S. revenues (down 24.6% versus the year-ago quarter), Embecta revealed in the Q3 2026 Press Release that the decrease in revenues was "primarily driven by $20.1 million of unfavorable changes in price" – *i.e.*, that Embecta had been selling its products at **lower** prices. In parsing Defendants' Q3 2026 results, J.P. Morgan analyst Rishi Parekh noted that sales volumes had come in better than expected and wondered whether price discounts had helped sales volumes:

> The Q3 print was sequentially better (volume better than expected [assume due to international growth], price worse than expected [question if discounts had a part in the improvement in volume] . . .[32]

118. Additionally, during the Q3 2026 Conference Call, Kurdikar noted that, after having evaluated Embecta's "commercial organization," Mr. Muzumdar had found "meaningful opportunities" to "enhance [Embecta's] commercial execution,"

---

[32] *See* Parekh, *supra* n. 29, at 1.

including through better "anticipating evolving customer needs" and "leveraging data-driven insights to inform decision-making;"

> Since joining Embecta, Nimesh has brought a fresh perspective and rigorous commercial lens to our North America business. Through a comprehensive assessment of our commercial organization, customer engagement model, and go-to-market capabilities, **his initial findings confirmed** that while our brand equity, customer trust, and product quality remain strong. **There are meaningful opportunities to enhance commercial execution by strengthening strategic customer partnerships, anticipating evolving customer needs, and leveraging data-driven insights to inform decision-making and drive growth**. As this will take time we expect that the combination of strong leadership, disciplined execution, and a clear strategic focus will strengthen our U.S. business.

Q3 2026 Conference Call, Bloomberg Tr. at 4 (Aug. 7, 2026).

## V. DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS

### A. Defendants' November 25, 2025 Disclosures

119. On November 25, 2025, Defendants: (i) reported Embecta's financial results of operations for the fourth quarter and full year of fiscal 2025 (ended September 30, 2025) and provided its 2026 Guidance; (ii) issued a press release setting forth Q4 and full-year 2025 results, the 2026 Guidance, and further discussing Embecta's operations, performance, and strategy (the "Q4 2025 Press Release"); (iii) filed an annual report on Form 10-K with the SEC for Fiscal 2025 (the "2025 10-K"); and (iv) hosted a conference call with analysts and investors to further discuss Embecta's operations and financial performance (the "Q4 2025 Conference Call").

### 1. The 2026 Guidance

120. Defendants published the 2026 Guidance in the Q4 2025 Press Release, whose main components – maintaining essentially stable revenues during fiscal 2026, thereby allowing Embecta to generate substantial free cash flow (to fund Embecta's "buy growth" strategy) – echoed, and thus appeared to further confirm, Defendants' Strategic Plan. Specifically, Defendants' 2026 Guidance stated:

**Preliminary Fiscal Year 2026 Financial Guidance:**
For fiscal year 2026, the Company expects:

| **Dollars in millions, except percentages and per share data** | |
|---|---|
| Reported Revenues | $1,071 - $1,093 |
| Reported Revenue Growth (%) | (0.9)% - 1.1% |
| *Impact of F/X (%)* | *1.2%* |
| *Impact of Italian Payback Measure [(1)] (%)* | *(0.1)%* |
| Adjusted Constant Currency Revenue Growth (%) | (2.0)% - 0.0% |
| Adjusted Operating Margin (%) | 29.0% - 30.0% |
| Adjusted Earnings per Diluted Share | $2.80 - $3.00 |

(1) Reflects the recognition of changes in estimates associated with the Italian payback measure relating to certain prior years since 2015 recorded in Revenues.

Q4 2025 Press Release at 8.

121. During the Q4 2025 Conference Call, Elguicze detailed Defendants' 2026 Guidance and emphasized that the level of financial performance it described was entirely in line with Defendants' Strategic Plan (*i.e.*, stabilize revenues at Embecta's top line, allowing for the generation of substantial free cash flow at Embecta's bottom line to ultimately fund Embecta's "buy growth" strategy):

> Next, **I'd like to discuss our preliminary 2026 financial guidance and certain underlying assumptions. Before I go into all the details surrounding our fiscal year 2026 guidance, let me remind you that in May of 2025, at our Analyst and Investor Day, we laid out our long-range plan through fiscal year 2028.**
>
> **Those expectations included that our revenue growth CAGR would**

> **remain flattish on a constant currency basis from fiscal year 2026 through 2028 with modest declines of approximately 1% to 2% in core injection and contract manufacturing revenue over the LRP period, offset by contributions from new revenue streams** . . .
>
> . . . **I'm pleased to say that we believe our initial fiscal 2026 financial guidance is well aligned with the expectations established in our long-range plan.**
>
> **Beginning with revenue. On an adjusted constant currency basis, we currently anticipate that our revenues will be flat to down 2% as compared to 2025 levels.**
>
> ***
>
> Finally, during fiscal 2026, we expect to generate between $180 million and $200 million in free cash flow . . .
>
> **Importantly, the free cash flow that we expect to generate during fiscal year 2026 keeps us firmly on pace with the commitment we outlined at our Analyst and Investor Day to generate approximately $600 million of cumulative free cash flow from fiscal 2026 through fiscal 2028, and demonstrates the strength of our cash generation model and reinforces our confidence in achieving our long-term deleveraging and investment objectives**.

Q4 2025 Conference Call, Bloomberg Tr. at 6-7 (Nov. 25, 2025).

122. Those statements regarding Embecta's 2026 Guidance, and the level of financial performance it communicated, were materially false and/or misleading because Defendants failed to disclose that: (i) the 2026 Guidance, and its strategy of buying growth (while having enough cash on hand to issue a dividend), which both depended on keeping Embecta revenues steady, in turn required Embecta to maintain its dominant position at Walgreens and avoid material share loss there; (ii) Embecta's share of pen needles sold at Walgreens had already begun eroding as

Walgreens was increasing its acquisition of HTL-Strefa's rival product; (iii) this erosion coincided with Walgreens' transition from supplier pricing predicated on back-end, post-sale rebates, which Embecta favored, to more transparent front-end discounting and/or cost-plus pricing structures, such as those offered by HTL-Strefa; (iv) Embecta was unwilling or unable to provide Walgreens with competitive up-front discounting and/or cost-plus pricing, and instead had to rely on back-end loaded pricing "concessions" to try to maintain its dominant share at Walgreens; and (v) Embecta then already anticipated that it was going to suffer additional share loss at Walgreens, as its pricing concessions remained uncompetitive and effectively a day late and a dollar short.

123. The 2026 Guidance's own assumptions underscored its dependence on Embecta holding its existing customer positions. As BTIG reported on November 25, 2025, even the low end of the guidance range assumed only "a 150 bps negative impact from volume declines" and "pricing flat y/y," while the high end assumed "modest volume declines within the core injection business" and likewise "pricing flat y/y."[33] Those assumptions could not be squared with what Defendants then knew: that Embecta had just made price concessions to retain Walgreens' business, and that Embecta's share at Walgreens was nonetheless eroding.

---

[33] *See* Thibault, *supra* n. 7, at 1.

### 2. Defendants' Characterization of Embecta's Q4 2025 Results

124. Although Defendants' 2026 Guidance indicated that Embecta would perform in line with Defendants' Strategic Plan, the actual financial results that Defendants contemporaneously reported for Embecta's most recently completed quarter (*i.e.*, for the fourth quarter of fiscal year 2025, ended September 30, 2025) appeared, on their face, to indicate the opposite.

125. For example, Embecta's Q4 2025 revenues had declined 10.4% from the year-ago quarter (on the Company's preferred "adjusted constant currency basis"), driven by a 15.2% decline in U.S. revenues. These material revenue declines appeared to indicate that Embecta's core business was (i) deteriorating, and (ii) deteriorating to such an extent as to undermine Embecta's ability to achieve the performance levels set forth in Defendants' 2026 Guidance and Strategic Plan. In other words, Embecta's Q4 2025 performance, at least at face value, threatened to scupper market belief in Defendants' 2026 Guidance and Strategic Plan.

126. For that reason, Defendants endeavored in their November 25, 2025 disclosures to insist that Embecta's Q4 2025 performance did not actually mean what it appeared to mean. According to Defendants, Embecta's apparently poor Q4 2025 financial results did not signify any deterioration in Embecta's core business, but instead was due to prior, non-recurring events that had had the effect of inflating Embecta's **prior-period** revenues.

127. For example, Defendants claimed that purported "advanced distributor ordering" during the year-ago quarter (*i.e.*, the fourth quarter of fiscal 2024), in advance of a then-looming port strike, had had the purported effect of artificially boosting Embecta revenues in the same quarter a year prior.

128. Similarly, Defendants claimed that another round of purported "advanced distributor ordering" in the immediately preceding quarter (*i.e.*, the third quarter of fiscal 2025), which Defendants attributed to unusual timing of the then-impending July 4, 2025 holiday, had had the purported effect of artificially boosting fiscal Q3 2025 revenues and the purported obverse effect of likewise artificially decreasing Q4 2025 revenues (as distributors still had sufficient stock from their larger fiscal Q3 2025 orders).

129. Indeed, Defendants led Embecta's Q4 2025 Press Release with exactly these arguments, seeking to explain away Embecta's poor Q4 2025 results as artifacts of these calendrical irregularities, rather than indicators of Embecta's core business:

> **Embecta Corp. Reports Fiscal 2025 Fourth Quarter and Full Year Financial Results; Provides Initial Fiscal Year2026 Financial Guidance**
>
> PARSIPPANY, N.J.,
>
> November 25, 2025 (GLOBE NEWSWIRE) – Embecta Corp. ("embecta" or the "Company") (Nasdaq: EMBC), a global diabetes care company, today reported financial results for the three- and twelve-month periods ended September 30, 2025.

> **"Our fourth quarter results were largely in line with our expectations, with revenue lower year over year due to several items we had previously anticipated, including the impact of advanced distributor ordering in the fourth quarter of fiscal year 2024 in advance of a potential U.S. port strike; the impact of advanced distributor ordering in the third quarter of fiscal year 2025 in advance of the U.S. July 4 holiday;** and the continuing business dynamics in China," said Devdatt (Dev) Kurdikar, Chief Executive Officer of embecta.

Q4 2025 Press Release at 1.

130. Defendants' above-identified representations concerning Embecta's Q4 2025 financial performance, together with substantively identical representations Defendants made during the Q4 2025 Conference Call detailed immediately below, were materially false and/or misleading. In essence, they constituted material *misdirection*: hiding and/or omitting to disclose any material deterioration in Embecta's **current** core injection business, including escalating share losses at Walgreens notwithstanding pricing concessions, and instead insisting that the real causes of Embecta's declining financial performance were **all in the past** – specifically, one-time irregularities that had distorted and/or artificially inflated Embecta's financial performance in past periods.

131. Defendants reiterated and expanded on this message during Embecta's Q4 2025 Conference Call.

132. Indeed, although Kurdikar claimed that Embecta's poor Q4 2025 results were attributable to the events described above, he mentioned a third cause:

namely, another purported one-off event involving a one-time pricing adjustment payment made during the quarter to "a large U.S. pharmacy customer" (which, only after the close of the Class Period, was publicly revealed to have been Walgreens (*see* ¶ 109, *supra*)):

> Now, let's review our revenue performance for the fourth quarter and full year. During the fourth quarter of fiscal year 2025, Embecta generated $264 million in revenue, reflecting a 7.7% decline year-over-year on an as-reported basis or a 10.4% decline on an adjusted constant currency basis. Within the U.S., revenue for the quarter totaled $142 million, reflecting a year-over-year decline of 15.2% on an adjusted constant currency basis.
>
> **The year-over-year decline was primarily driven by an unfavorable comparison to the prior year fiscal fourth quarter, which benefited from additional distributor orders that occurred because of the then looming U.S. port strike, totaling approximately $10 million, as well as the unwinding of the favorable order timing associated with the July 4th holiday that positively impacted our third quarter of 2025 results, totaling approximately $7 million. Additionally, year-over-year price in the U.S. was unfavorable by approximately $7 million, primarily due to milestone payments made to a large U.S. pharmacy customer**.

Q4 2025 Conference Call, Bloomberg Tr. at 3.

133. Upon later questioning from analysts, Kurdikar explained that the "milestone payments made to a large U.S. pharmacy customer" were merely rebates, the timing of which was contingent upon the customer having achieved certain pre-specified levels of Embecta's product sales, which just happened to coincide with the most recent quarter:

> Q - Michael Polark [analyst, Wolfe Research]

> Helpful color. For the follow-up I wanted to ask on one of the comments about the fourth quarter performance. I heard price unfavorable year-on-year in the U.S. $7 million mention of milestone payments to a large U.S. pharmacy customer. And I just want to make sure I understand what that is what you're saying there. The word milestone specifically tripped me up, so if you can add any color on that dynamic, I'd appreciate it. Thank you.
>
> A - Dev Kurdikar
>
> Yes. Mike, I'm happy to. Obviously, I won't talk about this specific contract, but **our contracts with the U.S. chains, there is a rebate level, right?** There are sometimes marketing spend items that we contribute to marketing of our products. **And finally, on achievement of certain volume levels, typically, there is an additional payment, and we often refer to them as milestone payment. At the end of the day, it all comes down to price, but depending upon the timing of the payments, it can lead to year-over-year unfavorability or favorability during the course of a quarter**.

Q4 2025 Conference Call, Bloomberg Tr. at 10-11.

134. However, as Kurdikar would later admit in May 2026, those rebate payments were, in fact, a pricing "concession" that Embecta made to the same large retail pharmacy customer with whom it had lost significant share volume. *See* ¶¶ 187-92, *infra*. And, as noted above, that large retail pharmacy customer was Walgreens, which decided no later than December 2025 – *i.e.*, just a few weeks after Class Period inception, and notwithstanding Embecta's pricing concessions – to give the majority of its pen needle business to Embecta's competitor, HTL-Strefa, which was willing to provide the up-front discounting and transparent pricing structure Walgreens preferred.

135. Accordingly, Defendants' discussion of the reasons for Embecta's disappointing Q4 financial results was misleading because it omitted material information, namely that its rebates to Walgreens were, in fact, pricing concessions that it offered in a last ditch bid to preserve its preferred status with Walgreens because it was unable or unwilling to offer its pen needles on the pricing terms that Walgreens wanted.

136. That discussion was further false and misleading because, as Kurdikar later admitted, Defendants knew that Embecta would suffer share loss with Walgreens when Embecta made those rebate-based pricing concessions but failed to disclose that information to investors. *See* Q2 2026 Conference Call, Bloomberg Tr. at 9 ("Now with respect to the competitive loss [with respect to the one large retail pharmacy customer], yes it was the same customer that we had referred to earlier [regarding the rebates]. Obviously, I don't want to talk about pricing at any specific customer or even broadly in the U.S. market **but I think what we've ended up is the share loss at that customer *is a little bit deeper than we anticipated*.**").

### 3. Materially Misleading Risk Disclosures in Embecta's 2025 10-K

137. Embecta's 2025 10-K contained an extensive presentation of "Risk Factors" (comprising more than 30% of the 2025 10-K). *See* 2025 10-K at 4-6 (summary risk factors), 6-30 (risk factors); *see also id.* at 35-36 (additional risk "trends").

138. As set forth below, Defendants included "Risk Factors" in the 2025 10-K, warning that:

A. Given Embecta's dependence on a handful of key products (*e.g.*, pen needles accounting for more than 70% of total revenues), any development that could adversely affect Embecta's pen needle sales or profitability could adversely affect Embecta's financial results (*see* ¶ 140, *infra*);

B. Given Embecta's dependence on a handful of key customers (three large distributors, who accounted for 42% of Embecta's gross revenues, and five large retail pharmacy chains, direct sales to whom accounted for a further 14% of Embecta's gross revenues), reductions in purchase volume and/or price from such customers could adversely affect Embecta's financial results (*see* ¶ 141, *infra*);

C. Competitive *supply side* pressures – *e.g.,* established and/or new providers of competing and/or lower-price products – could exert downwards pricing pressures that could adversely affect Embecta's financial results (*see* ¶ 142, *infra*);

D. Competitive *demand-side* and formulary placement pressures – *e.g.,* consolidation of purchasing power among large payers,

pharmacy benefit managers, and wholesalers; enhancing the importance of maintaining favorable formulary placement with such entities; and strengthening such entities' ability to extract price discounts for such placement – could exert downwards pricing pressures that could adversely affect Embecta's financial results (*see* ¶ 143, *infra*); and

E. Embecta could not guarantee its continued ability to maintain its dividend payments at current levels (*see* Section V.E, *infra*).

139. However, each of the risk factor disclosures that Defendants included in the 2025 10-K took the form of hypothetical and/or generalized truisms. For example, Defendants warned that, given Embecta's reliance on a handful of large customers, any reduction in the volume of products purchased by these customers, or of the prices these customers paid for Embecta's products, could adversely affect Embecta's financial results. This warning, however, is merely an empty truism: a logically indisputable axiom that applies equally at all times to any company with several large customers. Absent from this (and all other 2025 10-K risk factor disclosures) was any particularized disclosure or warning that one of Embecta's largest customers – specifically, Walgreens – was actually and materially reducing its purchasing of Embecta pen needles (and instead shifting share to an alternate, competing pen needle provider).

140. The 2025 10-K warned that, given Embecta's reliance on "a few key products" (most notably, pen needles), any events that affect the sales or profitability of such products – including volume and/or price decreases – could adversely affect Embecta's financial results:

> *Embecta generates a significant amount of its profits and cash flows from a few key products, and any events that adversely affect the sale or profitability of these products could have an adverse impact on Embecta's sales, results of operations and cash flows.* (Italics in original and bold omitted).
>
> Embecta's ability to generate profits and operating cash flow depends largely upon the continued profitability of its key products, such as its pen needles and syringes. For example, for the fiscal year ended September 30, 2025, sales of pen needles accounted for approximately $784 million, or 73%, of total net revenues. **Any event that adversely affects the sale or profitability of this product could adversely affect Embecta's sales, results of operations and cash flows. These adverse events could include a decrease in the demand for such products, the pressure to decrease the price of such products**, any increase in costs of manufacturing such products or other supply chain disruptions, **increased availability and marketability of competitive products**, increased competition from the introduction of new products related to the treatment of diabetes or removal from the market of these products for any reason.

2025 10-K at 7.

141. The 2025 10-K warned that, given Embecta's reliance on "a few customers" (most notably, three large distributors accounting for 42% of Embecta's gross sales, and five large pharmacy chains, direct sales to whom comprised a further 14% of Embecta's gross sales), any sales volume reductions, sales price reductions,

and/or share reductions from such customers could adversely affect Embecta's financial results:

> *A substantial portion of Embecta's revenue is derived from sales to a few customers. If these customers reduce the amount of product that they purchase from Embecta, reduce the amount that they are willing to pay for such products or increase charges to distribute such products, Embecta's business, financial condition and results of operations could be adversely affected.* (Italics in original and bold omitted).
>
> **A substantial portion of Embecta's revenue is derived from sales to a few customers. For example, for the fiscal year ended September 30, 2025, gross sales to Cencora, McKesson Corporation, and Cardinal Health, Embecta's three largest distributors, together represented approximately 42% of Embecta's worldwide gross sales**. The costs charged by these and other distributors to distribute Embecta's products is also subject to negotiation, and such distributors may propose increases in such charges from time to time. **In addition, for the fiscal year ended September 30, 2025, direct gross sales to the five largest retail pharmacies for Embecta's products together represented approximately 14% of Embecta's worldwide gross sales. If any of Embecta's largest customers reduce the amount of product that they purchase from Embecta, negotiate a reduced price for such products or increase the charges to distribute such products, each could have a material adverse effect on Embecta's business, financial condition and results of operations**.

2025 10-K at 9.

142. The 2025 10-K warned that *supply-side* competition (*i.e.*, the presence of competing product providers, including lower cost producers "particularly in emerging markets") could adversely affect the demand for and prices of Embecta's products, particularly in light of ongoing demand-side competition (such as payer pricing pressures to reduce product/treatment costs, intensified by growing

concentration of purchasing power among a smaller number of payers and wholesalers, allowing them greater ability to drive cost reductions):

> **Risks Related to Embecta's Business**
>
> *The medical technology industry is very competitive*. (Italics in original and bold omitted).
>
> Embecta faces significant competition from a wide range of companies in each market in which its products are sold. These include large companies with multiple product lines and non-traditional entrants such as technology companies, some of which may have greater financial and marketing resources than Embecta in the United States or other markets, as well as smaller, more specialized companies.
>
> Embecta's ability to compete will also be affected by changing preferences and requirements of people with diabetes, as well as changes in the ways healthcare services are delivered. **Efforts to contain healthcare costs by governments and the private sector are also resulting in increased emphasis on products that reduce costs, improve clinical results and expand access. Embecta's ability to remain competitive will depend on how well it will meet these changing market demands in terms of its product offerings and marketing approaches**.
>
> The medical technology industry is subject to rapid technological change and frequent introduction of new products. The development of new or improved products, processes or technologies by other companies (such as new technologies to administer insulin) that provide better features, pricing, clinical outcomes or economic value may make Embecta's existing or new products less competitive. In some instances, competitors, including pharmaceutical companies, also offer, or are attempting to develop, alternative therapies, including oral and once-weekly anti-diabetic drugs (e.g., SGLT-2s, once-weekly insulin, GLP-1s, and GLP-1 combination products), for disease states (including diabetes) that may be administered and delivered less frequently compared to conventional and historical multiple daily injections or without a medical device, such as pen needles, entirely. **Lower cost producers have also created pricing pressure, particularly in emerging markets. There can be no assurance that**

> **Embecta's products will be commercially successful, and it is possible that its business will be adversely affected from time to time as a result of products developed by its competitors.**

2025 10-K at 6-7.

143. The 2025 10-K warned that *demand-side* competition – notably, the concentration of purchasing power among a small number of large payers, pharmacy benefit managers, and wholesalers, intensifying the importance of maintaining favorable positioning in such entities' formularies and the ability of such entities to extract pricing discounts in exchange for favorable formulary positioning – could adversely affect Embecta's business and financial results:

> *Embecta's products are subject to continuous reimbursement, coverage and access scrutiny by both private and government payers, including the scope of products covered, access and coverage among product brands and manufacturers, reimbursement limitations and price adjustment restrictions. A change in any of these factors could have an adverse impact on Embecta's financial condition and results of operations*. (Italics in original and bold omitted).
>
> In the United States, both public and private payers continue to take aggressive steps to control their expenditures for medical devices by placing restrictions on how many and which brands of devices they will provide coverage for across the spectrum of available products. **Important competitive factors include** quality, **price**, price and inflation guarantees and demonstrated ability to supply markets. **Any failure by Embecta to differentiate its products with existing payers based on these and other factors or establish new payer relationships may adversely affect its financial condition and results of operations.**
>
> In addition, consolidation and integration among healthcare institutions and providers significantly affects the competitive landscape for medical devices. Health plans, pharmacy benefit managers ("PBMs"), wholesalers, and other supply chain stakeholders have been

consolidating into fewer, larger entities, thus enhancing their purchasing strength and importance. Specifically, private third-party insurers and governments typically maintain formularies that specify coverage (the conditions under which drugs and medical devices are included on a plan's formulary) and reimbursement (including both the associated out-of-pocket cost to the consumer and payment to the distributor) to control costs by negotiating discounted prices, inflation guarantees and other terms in exchange for formulary inclusion.

**Adverse formulary placement can lead to reduced usage of a medical device for the relevant patient population due to coverage restrictions, such as prior authorizations and formulary exclusions, or due to reimbursement limitations that result in higher consumer out-of-pocket cost, such as nonpreferred copay tiers, increased co-insurance levels, and higher deductibles. Consequently, medical device companies compete for formulary placement not only on the basis of product attributes but also by providing rebates. Price to the end customer is an increasingly important factor in formulary decisions, particularly in treatment areas in which the payer has taken the position that multiple branded products are therapeutically comparable (like that of diabetes). These downward pricing pressures could continue to negatively affect Embecta's business.** In addition to formulary placement, changes in insurance designs continue to drive greater consumer cost-sharing through high deductible plans and higher co-insurance or co-pays, increasing consumer sensitivity to product choice.

**Embecta is consistently managing the burden of continued pressures associated with payers' discount requirements to maintain positive formulary positions. If Embecta fails to maintain these formulary positions or reduces prices on its products to maintain these formulary positions, it could adversely affect Embecta's results of operations. In addition to the evolving payer market that continues to put price pressure on Embecta's products, new competitors have emerged. Competitors that are new to the pen needle and insulin syringe categories, along with some that have emerged to begin engaging with payers, have accelerated the focus on these product categories, providing payers more choices for formulary partners within these medical device categories.** In addition to pressures imposed by public and private payers, the Centers

> for Medicare & Medicaid Services ("CMS") of the U.S. Department of Health and Human Services ("HHS") has begun implementing measures outlined in the Inflation Reduction Act of 2022 to negotiate prices on certain high-cost prescription drugs for Medicare beneficiaries, as well as proposing competitive bidding on other medical devices, including those used for the treatment of diabetes. Embecta's products are covered by Medicare Part D covered medical devices and if there is any expansion of price negotiations or competitive bidding by CMS, or other agencies, for the category of products within which Embecta competes and Embecta is unable to successfully negotiate favorable pricing for its products, it could adversely impact Embecta's financial condition and results of operations. . .

2025 10-K at 9-10.

144. Embecta's above-referenced risk disclosures were false and misleading because, at the time they were issued, Defendants knew but failed to disclose that: (i) Embecta's share of pen needles sold at Walgreens had already begun eroding, as Walgreens was increasing its acquisition of HTL-Strefa's rival product; (ii) this erosion coincided with Walgreens' transition from supplier pricing predicated on back-end, post-sale rebates, which Embecta favored, to more transparent front-end discounting and/or cost-plus pricing structures, such as those offered by HTL-Strefa; (iii) Embecta was unwilling or unable to provide Walgreens with competitive up-front discounting and/or cost-plus pricing and instead had to rely on back-end loaded pricing "concessions" to try to maintain its dominant share at Walgreens; and (iv) Embecta then already anticipated that it was going to suffer additional share loss at

Walgreens, as its pricing concessions remained uncompetitive and effectively a day late and a dollar short.

145. In sum, the above-specified risk factor disclosures that Defendants included in the 2025 10-K warned of broad, hypothetical, unrealized risks that *could* materialize in the future, while omitting to disclose that these risks were already materializing and had actually manifested during the Class Period, rendering them materially false and/or misleading.

### B. Defendants' January 14, 2026 Disclosures

146. On January 14, 2026, Kurdikar appeared at the 44th Annual J.P. Morgan Healthcare Conference, to present on Embecta.

147. In his presentation, Kurdikar restated the elements of Embecta's Strategic Plan – maintaining Embecta's core business in the near/mid-term, in order to enable Embecta to transform via a "buy growth" strategy:

> . . . then last year, we said the capabilities of our company are better positioned for and can be better used for transitioning ourselves into a broad-based medical supplies company. And that is sort of the stated direction that we said last year.
>
> And so now in this phase, **what we are doing is obviously we want to continue to maintain our global leadership in our core products.** But we want to expand our product portfolio. And to expand their product portfolio, we want to do it organically, and I'll talk about that. But **we also want to create the flexibility to be able to do M&A, but we recognize to do that, we have to bring our net leverage down. And so we put a focus on increasing our financial flexibility. And over time, our goal still remains to transform ourselves into a broader-based medical supplies company. The three priorities that**

> **we have in this phase are obviously strengthening our core business. . .**
>
> . . . We are seeking growth opportunities across market. We want to expand our product portfolio, leveraging the strengths that we have. And then we want to continue to increase our financial flexibility.
>
> ***
>
> . . . But what we want to do here by bringing our net leverage down is increase our own capacity to do opportunistic M&A. Because remember, I said one of the things we need to do is expand our product portfolio. **I talked about organically how we can do it. But certainly, adding products through inorganic means will accelerate the process and accelerate our transformation**.
>
> So to close, just wanted to cap sort of what you heard today, right? **This is a resilient geographically diversified base business, strong free cash flow. There were a number of growth initiatives that we had highlighted at our Analyst Day in May. Significant progress made on each one of those. We're continuing to pay down debt. That will create some balance sheet flexibility for us. And then fundamentally, this phase that we are in the seed growth is an exciting phase because what we want to do here over the next 24 months or so, is really bring to life our transformation. By making progress on each one of these vectors and some potentially opportunistic M&A, we really changed the profile of this company from being simply a diabetes injection company to a broader-based medical supplies company and a drug delivery company. And that's super exciting to all of us. . .**

44th Annual J.P. Morgan Healthcare Conference, Embecta Presentation, Bloomberg Tr. at 3, 6 (Jan. 14, 2026).

148. Kurdikar's above-detailed statements regarding the core elements of Embecta's Strategic Plan and 2026 Guidance – keeping revenue steady and thereby generating sufficient earnings to fund the dividend and "buy growth" – were

materially false and/or misleading because they failed to disclose that: (i) the 2026 Guidance, and its strategy of buying growth (while having enough cash on hand to issue a dividend), which both depended on keeping Embecta revenues steady, in turn required Embecta to maintain its dominant position at Walgreens and avoid material share loss there; (ii) Embecta's share of pen needles sold at Walgreens had been eroding throughout the prior year, as Walgreens had been increasing its acquisition of HTL-Strefa's rival product; (iii) this erosion coincided with Walgreens' transition from supplier pricing predicated on back-end, post-sale rebates, which Embecta favored, to more transparent front-end discounting and/or cost-plus pricing structures, such as those offered by HTL-Strefa; (iv) Embecta was unwilling or unable to provide Walgreens with competitive up-front discounting and/or cost-plus pricing, and instead had to rely on back-end loaded pricing "concessions" to try to maintain its dominant share at Walgreens; and (v) Embecta, by late 2025, already anticipated that it was going to suffer additional share loss at Walgreens, as its pricing concessions remained uncompetitive and effectively a day late and a dollar short; and (vi) Walgreens had, in fact, already replaced Embecta with HTL-Strefa as its preferred pen needle brand no later than mid-December 2025, approximately one month before those statements.

149. Upon questioning from analysts about the pen needle market, and competitive pressures both within and external to it (e.g., lower-cost products within

the market, or alternative products that could diminish the market), Kurdikar emphasized that Embecta's pen needle business was "incredibly resilient:"

> **Look, I mean our, our pen needle business is incredibly resilient**. First of all, I'm again, just to stress a few points, these are medically necessary products. I mean, we are the unrivaled leader in this business.
>
> But I think it's important to sort of think about this geographically as well, right? I mean, take Type 1 patients are approximately 10 million globally, only a million and a half of are in the US, and pump adoption and GLP-1 is still pretty much a US phenomenon. If you think about Type 2 patients that use insulin, that's about 60 million to 70 million. Only about 7 million to 8 million are in the US the rest are outside the US. So first of all, I think understanding the fact that we are geographically diverse company where and we have strength in emerging markets where there are a disproportionate number of patients, sort of puts our product usage in perspective.
>
> Secondly, and as I mentioned before, GLP-1s most effective when actually there is insulin in the body. In fact, some of the data we've seen, there is a lot of concomitant use of GLP-1s with pen needles. Thirdly, I mean, look, the insurance rate on Type 2 are still increasing. Obviously, GLP-1 is not indicated for Type 1, Type 2 is growing. And there are affordability constraints around the use of these products outside the U.S. **So I think for all those reasons, our pen needles continue to show strength. Maybe one final point, particularly as it relates to the U.S.** One of the indicators we track is just what's happening with TRx, total prescriptions for insulin. And within that number, you can actually tease out what's happening for insulin vials versus what's happening for insulin pens. Insulin vials have been declining steadily. I talked about that. That impacts our syringe volume in the U.S. But insulin pens have been stable all throughout this period. Again, sort of showing the underlying resilience and the durability of that portfolio. And frankly, over the past few quarters, NRx, which is new prescriptions for insulin pens have been showing a slight positive trend. And so again, just exemplifying the resilience of this product portfolio.

44th Annual J.P. Morgan Healthcare Conference, Embecta Presentation, Bloomberg Tr. at 8.

150. Kurdikar's above-detailed January 14, 2026 statements concerning Embecta's "incredibly resilient" pen needle business, which "continue[d] to show strength," were materially false and/or misleading for the same reasons stated in ¶ 148, *supra*, because they failed to disclose that: (i) the 2026 Guidance, and its strategy of buying growth (while having enough cash on hand to issue a dividend), which both depended on keeping Embecta revenues steady, in turn required Embecta to maintain its dominant position at Walgreens and avoid material share loss there; (ii) Embecta's share of pen needles sold at Walgreens had been eroding throughout the prior year, as Walgreens had been increasing its acquisition of HTL-Strefa's rival product; (iii) this erosion coincided with Walgreens' transition from supplier pricing predicated on back-end, post-sale rebates, which Embecta favored, to more transparent front-end discounting and/or cost-plus pricing structures, such as those offered by HTL-Strefa; (iv) Embecta was unwilling or unable to provide Walgreens with competitive up-front discounting and/or cost-plus pricing and instead had to rely on back-end loaded pricing "concessions" to try to maintain its dominant share at Walgreens; (v) Embecta, by late 2025, already anticipated that it was going to suffer additional share loss at Walgreens, as its pricing concessions remained uncompetitive and effectively a day late and a dollar short; and (vi) Walgreens had,

in fact, already replaced Embecta with HTL-Strefa as its preferred pen needle brand no later than mid-December 2025, approximately one month prior to those statements.

**C. Defendants' February 5, 2026 Disclosures**

151. On February 5, 2026, Defendants: (i) reported Embecta's financial results of operations for the first quarter of fiscal 2026 (ended December 31, 2025); (ii) issued a press release setting forth Q1 2026 results and further discussing Embecta's operations, performance, and strategy (the "Q1 2026 Press Release"); (iii) filed a quarterly report on Form 10-Q with the SEC for the same period (the "Q1 2026 10-Q"); and (iv) hosted a conference call with analysts and investors to further discuss Embecta's operations and financial performance (the "Q1 2026 Conference Call").

152. Embecta's Q1 2026 results showed *inter alia* that revenues had fallen 2.0% from the year-ago quarter (on an adjusted constant currency basis), with U.S. revenue declines of 7.6% partially offset by international revenue growth of 4.6%.

153. In the Q1 2026 Press Release, Defendants characterized Embecta's Q1 2026 results as "largely consistent with our expectations," and, purportedly in light of Embecta's Q1 2026 results, maintained and reaffirmed the 2026 Guidance:

> **Embecta Corp. Reports First Quarter Fiscal 2026 Financial Results**
>
> PARSIPPANY, N.J.,

> Feb 5, 2026 (GLOBE NEWSWIRE) – Embecta Corp. ("embecta" or the "Company") (Nasdaq: EMBC), a global diabetes care company, today reported financial results for the three month period ended December 31, 2025.
>
> **"During the first quarter our results were largely consistent with our expectations,"** said Devdatt (Dev) Kurdikar, President and Chief Executive Officer of embecta.
>
> Mr. Kurdikar added, "As we look ahead, we remain focused on pursuing initiatives that will transform the company into a broad-based medical supplies company which serves chronic care patients and drug delivery partners. This includes maintaining our global leadership position in core injection products, expanding our product portfolio, and creating additional financial flexibility through ongoing debt reduction. **Given our performance during the first quarter, coupled with our outlook for the remainder of the year, we are maintaining our previously provided guidance for key financial reporting metrics**."

Q1 2026 Press Release at 1.

154. In his initial remarks during the Q1 2026 Conference Call, Kurdikar reiterated the same assertions:

> The stand-up phase was focused on becoming a fully independent company by building our own systems, supply chain, and commercial capabilities while keeping the base business stable. Fiscal year 2025, largely marked the completion of that phase with the operationalization of our own ERP, distribution, and shared services infrastructure . . .
>
> With that work behind us, we are now firmly in the seed growth phase, and this is where the company's focus is now. **This phase's goals focus on staying competitive in the core, selectively expanding the portfolio in areas that leverage our existing strengths, and building financial flexibility through disciplined capital allocation**.
>
> ***
>
> Finally, we remain focused on increasing financial flexibility.

> Following the significant deleveraging achieved through fiscal year 2025, we continue to focus on free cash flow generation and disciplined capital allocation to create strategic optionality as we progress through the seed growth phase.
>
> In summary, while fiscal year 2025 marked the completion of our stand-up phase, Embecta today is focused on execution, portfolio expansion, and positioning the company for durable long-term growth.
>
> With that context, let me now review our revenue performance for the first quarter.
>
> During the first quarter of fiscal year 2026, Embecta generated approximately $261 million in revenue, reflecting a 0.3% decline year-over-year on an as-reported basis, or a 2% decline on an adjusted constant currency basis. **These results were largely in line with our expectations** driven by performance within our international business.
>
> Within the U.S., revenue for the quarter totaled approximately $131 million, reflecting a year-over-year decline of 7.6% on an adjusted constant currency basis. The decline was driven by a combination of lower pricing, as well as lower volumes reflecting channel dynamics. This was somewhat offset by order timing.
>
> ***
>
> And before I turn the call over to Jake**, I'd like to briefly touch upon our financial guidance for the year. Today, we reaffirmed our previously provided financial guidance ranges. However, we now expect to be closer to the lower end of those guidance ranges, driven by incremental U.S. pricing headwinds**. Somewhat offsetting this incremental pressure within the U.S. is an improved outlook for our international business.

Q1 2026 Conference Call, Bloomberg Tr. at 2, 4-5 (Feb. 5, 2026).

155. Similarly, Elguicze, in his initial Q1 2026 Conference Call remarks, echoed the same assertions and reaffirmation of the 2026 Guidance. Additionally, Elguicze offered new detailed facts appearing to support Embecta's ability to

achieve 2026 Guidance performance levels (notwithstanding that Q1 2026 results had fallen short of those levels) – namely, that Defendants expected Embecta's fiscal year 2026 results to be more lopsided than normal, with 54% of total revenues expected in the second half of fiscal year 2026 and only 46% in the first half, meaning that first-half shortfalls essentially counted less):

> That completes my prepared remarks on our first quarter 2026 results. Next, I would like to discuss our 2026 financial guidance and certain underlying assumptions.
>
> **Beginning with revenue, on an adjusted constant currency basis, we are reaffirming our previously provided guidance range, which called for revenue to be flat to down 2% as compared to 2025 levels**. . .
>
> On a combined basis, **our as-reported revenue guidance continues to call for a range of between negative 0.9% to positive 1.1%, resulting in a revenue guide of between $1,071 million and $1,093 million. As Dev previously mentioned, we currently expect that we will be closer to the lower end of that range**.
>
> Turning to adjusted operating margin and adjusted diluted earnings per share, we are also reaffirming those previously provided guidance ranges of between 29% and 30% for adjusted operating margin, and for between $2.80 and $3.00 in terms of adjusted EPS.
>
> Like my comments regarding our expectations concerning revenue, we currently expect to be closer to the lower end of those ranges because of the incremental headwinds we are now anticipating within the U.S. during the first half of the year.
>
> Turning to the balance sheet and cash flow, we continue to expect that during 2026 we will repay approximately $150 million in debt, and that we will generate between $180 million and $200 million in free cash flow, although closer to the low end of that range.

* * *

> During fiscal year 2026, we previously expected a similar cadence of revenue performance. **Currently, we expect to generate approximately 46% of our adjusted revenue dollars during the first half of the year, and approximately 54% of our adjusted revenue dollars during the second half of the year**.

Q1 2026 Conference Call, Bloomberg Tr. at 6.

156. Defendants' statements reaffirming Embecta's 2026 Guidance were materially false and/or misleading because they failed to disclose that: (i) the 2026 Guidance, and its strategy of buying growth (while having enough cash on hand to issue a dividend), which both depended on keeping Embecta revenues steady, in turn required Embecta to maintain its dominant position at Walgreens and avoid material share loss there; (ii) Embecta's share of pen needles sold at Walgreens had been eroding throughout the prior year, as Walgreens had been increasing its acquisition of HTL-Strefa's rival product; (iii) this erosion coincided with Walgreens' transition from supplier pricing predicated on back-end, post-sale rebates, which Embecta favored, to more transparent front-end discounting and/or cost-plus pricing structures, such as those offered by HTL-Strefa; (iv) Embecta was unwilling or unable to provide Walgreens with competitive up-front discounting and/or cost-plus pricing, and instead had to rely on back-end loaded pricing "concessions" to try to maintain its dominant share at Walgreens; (v) Embecta, by late 2025, already anticipated that it was going to suffer additional share loss at Walgreens, as its

pricing concessions remained uncompetitive and effectively a day late and a dollar short; (vi) Walgreens had, in fact, already replaced Embecta with HTL-Strefa as its preferred pen needle brand no later than mid-December 2025, approximately two months before those statements; and (vii) therefore, Embecta's 2026 Guidance was without basis and no longer valid.

157. Indeed, in response to further analyst questioning concerning the impact of pricing headwinds on Defendants' outlook and 2026 Guidance, Elguicze represented that volume (*i.e.*, the number of product units Embecta sold) was actually stronger than Defendants had initially envisioned, which provided Defendants with continuing conviction in the 2026 Guidance, notwithstanding slightly worse pricing:

> Q – Gracia Leydon Mahoney [analyst, Bank of America]
>
> . . . maybe just one follow up on the pricing headwind. Any way to sort of quantify that incremental headwind that you're seeing and maybe what's baked in on the top end and low end of the guide in regards to that now, since those dynamics have changed around?.
>
> A – Jake Elguicze
>
> Sure, Gracia. This is this is Jake. I think, in our prepared remarks, we talked about how we think that we're going to be closer to the lower end of the revenue guidance range due to the incremental pricing headwinds. . .
>
> **From a volume standpoint, the high end of the guide called for volumes to be down about 50 basis points. The low end of the guide previously called for volumes to be down about 150 basis points, net right now, we actually think that volumes year-over-year, I think importantly, are coming in a little bit stronger, there, and**

> **right now the current guide calls for volumes to sort of be flattish a year-over-year**.
>
> **And in large part, I would say, relative stability in terms of the U.S. market for the full year, and in terms of an international and improved outlook internationally as compared to the original guide. So, I think volumes remaining stable now as compared to say, previously at the midpoint, we would have called for about a 1% headwind**.
>
> In terms of new products, the low end of the guide previously called for sort of flattish contribution from new products. The high end of the guide called for about 1% growth year-over-year coming from new products. And right now, I think the current guide calls for positive contribution of about 50 basis points.
>
> So, essentially, right now, sort of the new product contribution, being around 50 basis points, sort of offsetting those contract manufacturing headwinds of about 50 basis points, the core volumes being relatively flattish. And, right now, just given some of the more recent, pricing dynamics, impacting the U.S. business, that's really what's causing us now to be closer, to the lower end of our current guidance range as compared to previously when we initially provided guidance, we thought that pricing was largely going to be flat year-over-year.

Q1 2026 Conference Call, Bloomberg Tr. at 9-10.

158. Defendants' statements regarding pricing and the volume of Embecta's sales were materially false and/or misleading because they failed to disclose that: (i) Embecta was no longer Walgreens' preferred supplier of pen needles due to Embecta's inability or unwillingness to provide acceptable pricing terms to Walgreens; (ii) Embecta's main competitor, HTL-Strefa, was now Walgreens' preferred provider of pen needles; and (iii) as a result, Defendants then knew that Embecta's sales volumes would actually fall dramatically in 2026.

### D. Defendants' Violations of Item 303 of Regulation S-K

159. Defendants also violated their affirmative obligations to provide certain material information in the 2025 10-K and Q1 2026 10-Q, as Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303") requires companies to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

#### 1. Operative Item 303 Disclosure Requirements

160. In May 1989, the SEC issued an interpretive release on Item 303 (the "Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> * * *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.[34]

[34] *See* SEC Interpretive Release No. 33-6835, SEC, *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures* (May 18, 1989), https://www.sec.gov/files/rules/interp/33-6835.htm.

161. Further, the Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, **event or uncertainty** is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur. *Id.*

162. Item 303 thus requires disclosure of known trends, events, ***or*** uncertainties that are **reasonably likely to have a material effect** on the company's financial condition or operational results.

### 2. Defendants' Item 303 Disclosures Were Marred by Material Omissions

163. In their quarterly and annual Class Period filings with the SEC on Forms 10-K and 10-Q, Defendants provided the following Item 303 "trend" disclosures, in relevant part:

> **Key Trends Affecting Our Results of Operations**
>
> * * *
>
> Pricing Pressures. We face significant pricing pressures from competitors in the pen needle and insulin syringe categories who not only can provide competitive products at lower costs, but also provide

> payors and customers with more choices for formulary partners in these categories. In addition, the increased scrutiny by regulators on healthcare spending, which accelerated in light of the COVID-19 pandemic, along with a shift towards volume-based procurement and group purchasing organizations, which generally values lower cost over product features, benefits and quality, have placed significant pressure on Embecta to lower price in both developed and emerging markets. These trends may reduce our operating margins, which are only partially offset by our ability to differentiate our products and sell at higher prices.

2025 10-K at 35; Q1 2026 10-Q at 20.

164. However, **after** the Class Period, in Embecta's Form 10-Q for the second quarter of fiscal year 2026, filed with the SEC on May 5, 2026, Defendants amended and expanded Embecta's Item 303 trends disclosures concerning "Pricing and Volume Pressures," which, for the first time, included the additional admonition emphasized below:

> Pricing **and Volume** Pressures. We face significant pricing pressures from competitors in the pen needle and insulin syringe categories who not only can provide competitive products at lower costs, but also provide payors and customers with more choices for formulary partners in these categories. **As a result, select distributors and retailers, especially in the United States, can exercise substantial pricing pressure power in view of the competitive nature of our business which can significantly affect sales volume and market share**. In addition, the increased scrutiny by regulators on healthcare spending, which accelerated in light of the COVID-19 pandemic, along with a shift towards volume-based procurement and group purchasing organizations, which generally values lower cost over product features, benefits and quality, have placed significant pressure on Embecta to lower price in both developed and emerging markets. These trends may reduce our operating margins, which are only partially offset by our ability to differentiate our products and sell at higher prices.

Q2 2026 Form 10-Q at 22.

165. The additional "trends" disclosure that Defendants added after the Class Period – that "select distributors and retailers, especially in the United States, can exercise substantial pricing pressure power in view of the competitive nature of our business which can significantly affect sales volume and market share" – was spurred by, and intended to describe, the share loss at Walgreens that Defendants first publicly revealed on May 5, 2026.

166. Although Embecta's post-Class Period trends disclosure featured the above-identified additional language, **the trend described by that language was not itself new**.

167. First, the proposition that "select distributors and retailers, especially in the United States, can exercise substantial pricing pressure power in view of the competitive nature of our business which can significantly affect sales volume and market share" described a longstanding condition of Embecta's business that had existed for years, rather than one that had only recently developed. Walgreens, and similar national pharmacy chains, did not suddenly develop, during the first calendar quarter of 2026, new abilities to exercise pricing pressure that could significantly affect Embecta's sales volume and market share. To the contrary, they enjoyed that very ability at (and prior to) Class Period inception.

168. Second, Defendants' *post facto* additional trends disclosure, made only after having revealed Embecta's share loss at Walgreens, necessarily functions as a double concession that: (i) such disclosure had been **omitted** from prior, Class Period trends disclosures; and (ii) the omission of such disclosure was **material**. After all, were the additional *post facto* disclosures not material, Defendants would not have needed to add them.

169. In sum, Defendants' revised, post-Class Period trends disclosure amounted to little more than closing the barn door **after** the horse had already bolted.

170. Conversely, Defendants' Class Period trends disclosures omitted material information then known to them, namely that (i) the barn door was open, and (ii) the horse was not only eyeing, but bolting for, the exit.

171. Specifically, Defendants' failure to disclose in Embecta's Class Period trends disclosures the facts detailed in ¶¶ 77-99, *supra* – namely, that (i) national retail pharmacies, such as Walgreens, were transitioning to a preferred supplier model based on provision of up-front, rather than contingent, back-end discounts; (ii) lower-cost providers willing to provide steeper up-front discounting were gaining share at Walgreens and other such pharmacies; and (iii) by no later than mid-December 2025, Walgreens had displaced Embecta and installed HTL-Strefa in Embecta's place as Walgreens' preferred provider of pen needles, given HTL-Strefa's superior, up-front discount pricing – violated Item 303 because these

undisclosed adverse events, trends, and uncertainties were known to Defendants and were reasonably likely to have, and did have, a material adverse effect on Embecta's financial condition, revenue, and income.

172. These trends, events, and/or uncertainties were known to Defendants, because, *inter alia*: (i) Defendants' access to real-time data concerning Embecta's orders, shipments, and sales made them aware of initial share declines at Walgreens prior to Class Period inception (*see* Section VI.A, *infra*); and (ii) as Kurdikar admitted after the Class Period, having been so aware, Defendants had sought, also prior to the Class Period, to counteract Embecta's Walgreens share losses and stabilize Embecta's Walgreens sales volumes by extending further price discounts to Walgreens (*see* Section VI.B, *infra*).

### E. Defendants' Dividend-Related Disclosures

173. At the Class Period's inception, Embecta's 2025 10-K warned that continued payment of dividends at current payment levels (or at all) could not be guaranteed and were at heightened risk of diminishment in light of Embecta's lack of diversification, dependence on a handful of key products for nearly all of its revenues and earnings, and hence heightened exposure to material adverse developments in those product markets:

> *Embecta cannot guarantee the timing, amount or payment of dividends on its common stock.* (Italics in original and bold omitted).

> Embecta currently expects that it will pay a regular cash dividend. However, the timing, declaration, amount and payment of any dividends will be within the discretion of Embecta's Board of Directors, and will **depend upon many factors, including Embecta's financial condition, earnings**, capital requirements of its operating subsidiaries, covenants associated with certain of Embecta's debt service obligations, legal requirements, regulatory constraints, industry practice, ability to access capital markets, and other factors deemed relevant by Embecta's Board of Directors. Moreover, Embecta cannot guarantee that it will continue to pay any dividends in the future and cannot guarantee the amount of any such dividends.

2025 10-K at 29.

***

> *Since the Separation, Embecta's financial profile has changed, and it is a smaller, less diversified company than BD prior to the Separation.*
>
> The Separation has resulted in Embecta being a smaller, less diversified company than BD. As a result, **Embecta may be more vulnerable to changing market conditions, which could have a material adverse effect on its business, financial condition and results of operations**. In addition, the diversification of Embecta's revenues, costs, and cash flows has diminished as a standalone company, such that its results of operations, cash flows, working capital and financing requirements may be subject to increased volatility and its ability to fund capital expenditures and investments, pay dividends and service debt may be diminished.

2025 10-K at 24.

174. Just as with the other risk disclosure statements discussed above (*see* Section V.A.3, *supra*), Defendants' risk disclosure statements regarding Embecta's continued dividend payments were themselves materially misleading.

A. First and generally, just as with the other risk factor disclosures that Defendants included in the 2025 10-K, the above-detailed,

dividend-specific risk factors warned of broad, hypothetical, unrealized risks that *could* materialize in the future, while omitting to disclose that these risks were already materializing and had actually manifested during the Class Period, rendering them materially false and/or misleading.

B. Second and specifically:

a) To warn that Embecta's continued dividend payments could be placed at risk by "changing market conditions, which could have a material adverse effect on [Embecta's] business, financial condition and results of operations," while omitting to disclose the **actual, contemporary materialization of exactly such "changing market conditions"** – namely, the conditions set forth in ¶¶ 77-99, *supra* – rendered Defendants' generalized hypotheticals, though axiomatically true, materially misleading in effect.

b) Likewise, to warn that Embecta's continued dividend payments depended on Embecta's continued ability to maintain its "financial condition" and "earnings" at levels sufficient to allow Embecta to fund such dividend payments, while omitting to disclose the **advent of events**

**whose direct financial impacts would fundamentally and materially undermine Embecta's financial condition and earnings** – namely, the events set forth in ¶¶ 77-99, *supra* – rendered Defendants' generalized hypotheticals, though axiomatically true, materially misleading in effect.

175. On the same day as Defendants made these dividend-related risk disclosures, Kurdikar simultaneously insisted on Embecta's intention, and continued capacity, to maintain dividend payments to shareholders at current levels, even while reserving additional funds for prospective strategic acquisitions:

> **Our capital allocation plans remain unchanged from what I said on Investor Day. We think $600 million in free cash flow over the next three years, most of that will go to debt pay down. We pay a dividend at this point. We are not considering changing that**. And our highest priority still remains paying down debt. But as our leverage comes down, certainly it's already below 3x and we drive it down further in 2026. We are very open to organic and inorganic investments.
>
> And so, M&A, by obviously its very nature, is very opportunistic. We will continue to be alert and aware if such an opportunity arises and we feel that it is going to be value accretive to our company and help transition the company towards long-term sustainable growth. We certainly will be ready to act on it.

Q4 2025 Conference Call, Bloomberg Tr. at 13.

176. Kurdikar's above-identified November 25, 2025 statements regarding Embecta's free cash flow and its ability to fund both corporate acquisitions and

continuing dividends were materially false and/or misleading because Defendants failed to disclose that: (i) the 2026 Guidance, and its strategy of buying growth (while having enough cash on hand to issue a dividend), which both depended on keeping Embecta revenues steady, in turn required Embecta to maintain its dominant position at Walgreens and avoid material share loss there; (ii) Embecta's share of pen needles sold at Walgreens had already begun eroding, as Walgreens was increasing its acquisition of HTL-Strefa's rival product; (iii) this erosion coincided with Walgreens' transition from supplier pricing predicated on back-end, post-sale rebates, which Embecta favored, to more transparent front-end discounting and/or cost-plus pricing structures, such as those offered by HTL-Strefa; (iv) Embecta was unwilling or unable to provide Walgreens with competitive up-front discounting and/or cost-plus pricing and instead had to rely on back-end loaded pricing "concessions" to try to maintain its dominant share at Walgreens; (v) Embecta then already anticipated that it was going to suffer additional share loss at Walgreens, as its pricing concessions remained uncompetitive and effectively a day late and a dollar short; all of which (vi) materially threatened Embecta's continued ability to pay a dividend remotely in line with prior quarters while still financing its planned corporate acquisitions.

177. Kurdikar repeated the same message in his January 14, 2026 remarks at the 44th Annual J.P. Morgan Healthcare Conference:

> Let me talk about our capital allocation priorities. First is debt paydown. . . we said, look we need to bring our net leverage down. And we made significant strides last year. We paid down almost $185 million of debt during fiscal 2025. Our net leverage, which was almost four at the beginning of fiscal 2025, became under three at the end of fiscal 2025. **We pay a dividend, right? So, there is a return of capital to shareholders. But what we want to do here by bringing our net leverage down is increase our own capacity to do opportunistic M&A. Because remember, I said one of the things we need to do is expand our product portfolio.** I talked about organically how we can do it. But certainly, adding products through inorganic means will accelerate the process and accelerate our transformation.

J.P. Morgan Healthcare Conference Embecta Presentation, Bloomberg Tr. at 5-6.

178. Kurdikar's January 14, 2026 statements regarding Embecta's free cash flow, corporate acquisitions, and planned dividends were materially false and/or misleading because Defendants failed to disclose that: (i) the 2026 Guidance, and its strategy of buying growth (while having enough cash on hand to issue a dividend), which both depended on keeping Embecta revenues steady, in turn required Embecta to maintain its dominant position at Walgreens and avoid material share loss there; (ii) Embecta's share of pen needles sold at Walgreens had been eroding throughout the prior year, as Walgreens had been increasing its acquisition of HTL-Strefa's rival product; (iii) this erosion coincided with Walgreens' transition from supplier pricing predicated on back-end, post-sale rebates, which Embecta favored, to more transparent front-end discounting and/or cost-plus pricing structures, such as those offered by HTL-Strefa; (iv) Embecta was unwilling or unable to provide Walgreens with competitive up-front discounting and/or cost-plus pricing and instead had to

rely on back-end loaded pricing "concessions" to try to maintain its dominant share at Walgreens; (v) Embecta, by late 2025, already anticipated that it was going to suffer additional share loss at Walgreens, as its pricing concessions remained uncompetitive and effectively a day late and a dollar short; (vi) Walgreens had, in fact, already replaced Embecta with HTL-Strefa as its preferred pen needle brand no later than mid-December 2025, approximately one month prior to those statements; all of which (vii) materially compressed Embecta's fiscal 2026 free cash flows and severely undermined Embecta's ability to continue to pay a dividend in line with prior quarters, while still funding its planned corporate acquisitions.

179. In their February 5, 2026 disclosures, Defendants again reiterated the same message. For example, during the Q1 2026 Conference Call, Elguicze emphasized Embecta's purported continuing ability, even after devoting substantial portions of Embecta's cash flow to paying down debt, to generate substantial free cash flow during fiscal 2026 sufficient to fund both Embecta's current dividend and Embecta's strategic acquisition goals:

> Turning to the balance sheet and cash flow, we continue to expect that during 2026 we will repay approximately $150 million in debt, and that **we will generate between $180 million and $200 million in free cash flow**, although closer to the low end of that range.

Q1 2026 Conference Call, Bloomberg Tr. at 6.

180. Elguicze's February 5, 2026 statements regarding Embecta's free cash flows, upon which dividends depended, remaining in line with 2026 Guidance levels

were materially false and/or misleading because Defendants failed to disclose that: (i) the 2026 Guidance, and its strategy of buying growth (while having enough cash on hand to issue a dividend), which both depended on keeping Embecta revenues steady, in turn required Embecta to maintain its dominant position at Walgreens and avoid material share loss there; (ii) Embecta's share of pen needles sold at Walgreens had been eroding throughout the prior year, as Walgreens had been increasing its acquisition of HTL-Strefa's rival product; (iii) this erosion coincided with Walgreens' transition from supplier pricing predicated on back-end, post-sale rebates, which Embecta favored, to more transparent front-end discounting and/or cost-plus pricing structures, such as those offered by HTL-Strefa; (iv) Embecta was unwilling or unable to provide Walgreens with competitive up-front discounting and/or cost-plus pricing and instead had to rely on back-end loaded pricing "concessions" to try to maintain its dominant share at Walgreens; (v) Embecta, by late 2025, already anticipated that it was going to suffer additional share loss at Walgreens, as its pricing concessions remained uncompetitive and effectively a day late and a dollar short; (vi) Walgreens had, in fact, already replaced Embecta with HTL-Strefa as its preferred pen needle brand no later than mid-December 2025, approximately two months prior to those statements; all of which (vii) materially compressed Embecta's fiscal 2026 free cash flows and severely undermined

Embecta's ability to continue to pay a dividend in line with prior quarters, while still funding its planned corporate acquisitions.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

### A. Defendants' Access to Real-Time Data

181. As discussed above, following Embecta's April 2022 spinoff from Becton Dickinson, one of Defendants' foremost "stand up" priorities was to obtain and implement a new, state-of-the-art ERP system for Embecta (*see* Section IV.C, ¶ 49, *supra*). Between 2022 and 2024, Defendants spent hundreds of millions of dollars on stand-up work, including that ERP system.[35]

[35] As Kurdikar reminisced: "I remember when we spun off, and we were about to start our ERP implementation project. We had to start by building an IT team. We had to select vendors that were going to help us undertake this journey, and I think those in the audience that have dealt with ERP implementations before, you know how fraught they are, how complex they are, and especially in our case, where we are deploying an ERP, setting up a new distribution network, setting up shared services capabilities all simultaneously, and we had a time crunch to get it done. . . And I'm very proud that the team did it all. Now, I'll admit, it was expensive. Over the life of the separation work at the end of fiscal 2024, it's probably cost us around $400 million to get it done. This is expensive work." *See* Embecta Presentation, 43rd Annual J.P. Morgan Healthcare Conference, Bloomberg Tr. at 6-7 (Jan. 15, 2025). On June 10, 2025, Elguicze described the costs to be "between, let's call it, $400 million to $450 million in cash over the last three years to try and stand ourselves up." *See* Embecta Presentation, Goldman Sachs 46th Annual Global Healthcare Conference, Bloomberg Tr. at 2.

182. Subsequently, in a customer case study featuring Embecta by ERP provider SAP that was published on SAP's website,[36] Company officials, including Kurdikar, extolled the virtues and capabilities of Embecta's new ERP system, including its ability to provide Embecta management with unprecedented "real time visibility" into Embecta's operations and finances:

> **Explore embecta's journey with SAP**
>
> "Thanks to the work we've been able to do with SAP, we've achieved significant milestones on our separation journey. **RISE with SAP, which includes SAP S/4HANA Cloud Private Edition and SAP Business Technology Platform, underpins one global platform with the analytics tools we need for real-time visibility into our operations."**
> **Devdatt Kurdikar**
> **CEO, embecta**
>
> ***
>
> **Nimbly deploying a high-performing IT landscape across the globe**
>
> **What's more, integrating SAP Analytics Cloud with the private edition of SAP S/4HANA Cloud for group reporting provides embecta with on-demand insights, a comprehensive groupwide view, and agile business steering**. . .
>
> **Transitioning successfully while helping ensure stability for patients**
>
> * * * *
>
> **Tight integration between the private edition of SAP S/4HANA Cloud for group reporting and SAP Analytics Cloud lets embecta plan and forecast accurately with sophisticated analytics tools and**

---

[36] *See Customer Stories: Embecta*, SAP, https://www.sap.com/asset/dynamic/2024/11/f4bd861d-e47e-0010-bca6-c68f7e60039b.html (last visited Oct. 22, 2026).

> **consolidate financial data smoothly. Consolidation logic in the planning data provides real-time visibility into financial health and performance across different areas, aiding data consistency and reliability. And the ability to swiftly make data-driven decisions empowers the company to react quickly to market changes, enhancing its agility and competitive edge. This holistic approach not only streamlines the financial consolidation process but also optimizes strategic planning and operational efficiency across the company**.
>
> A better overview of order cycles helps embecta provide better customer service. **Kurdikar says, "Our partnership with SAP enabled us to implement a single global platform with the right analytical tools. This provides real-time visibility into the cycle of when we receive an order, when it arrives at a distribution center, when it's shipped, and when we invoice. I've been in the industry for almost 30 years, and this is the first time I've seen this kind of real-time information in a single screen on a dashboard**."

183. Defendants' self-described "real time visibility" into Embecta's customer orders, customer shipments and customer sales allowed them to see, even prior to Class Period inception, that Embecta's share at Walgreens had been deteriorating and thus that its competitors had been making increasing inroads into Walgreens' shelves.

184. By the third quarter of fiscal 2025 (ended June 30, 2025), well before the Class Period, the ERP rollout was complete, with "100% of revenue now going through EMBC ERP systems."[37] And Defendants used precisely this kind of customer-level ordering data to monitor Embecta's retail pharmacy business: in May

[37] *See* Mike Polark, *EMBC: Update Looked 'Ultra-Fine' to Us (FY3Q25 Review)*, Wolfe Research at 1 (Aug. 8, 2025).

2025, when Defendants cut fiscal 2025 revenue guidance for lower volumes at "a specific U.S. retail pharmacy customer," management explained that "the scale, pace and observed changes in ordering patterns at the third-party distributor led them to adjust their outlook." [38]

185. Indeed, as discussed immediately below in Section VI.B, *infra*, Kurdikar admitted **after** the Class Period that Embecta had been aware of its deteriorating Walgreens share **prior to** the Class Period – specifically, no later than September 30, 2025 – and had made efforts to stabilize its Walgreens share during the quarter ended September 30, 2025 by extending further price concessions to Walgreens.

186. Defendants were also closely attuned, before the Class Period, to the threat that lower-priced competitors posed to Embecta's retail share. As BTIG reported following investor meetings it hosted with Kurdikar in mid-September 2025 – during the very quarter in which Embecta was making "milestone payments" to "a large U.S. pharmacy customer" – "EMBC has retained its market share," and "[t]hough competitors may occasionally compete on pricing discounts, management

[38] *See* Marie Thibault, *Another Quarter of Beats but Underlying Sales Outlook Reduced for Pharmacy Store Closures Tariffs Offset to Hold EPS Guide*, BTIG at 1 (May 9, 2025).

explained that volume is also important to customers and that they often return to EMBC after finding the volume shift smaller than expected."[39]

**B. Kurdikar's Post-Class Period Admissions Indicate Defendants Had Been Aware of Walgreens' Share Loss/Risk Even Prior to the Beginning of the Class Period**

187. On May 5, 2026 and as set forth above, Defendants revealed Embecta's cratering share "at a single customer," as well as the numerous and material adverse consequences driven by that share loss. Those consequences included (i) sharp declines in Q2 2026 revenues, earnings, and cash flows; (ii) the expectation that full-year fiscal 2026 revenues would materially decline from fiscal 2025, invalidating not only the 2026 Guidance (which Defendants materially reduced), but the core foundation of Embecta's Strategic Plan (namely, maintaining Embecta's revenues at a stable level); and (iii) effective elimination of Embecta's dividend.

188. During the Q2 2026 Conference Call, Defendants faced multiple questions from analysts concerning Embecta's share loss at the "single customer," *i.e.* Walgreens.

189. BTIG analyst Marie Thibault began the Q&A portion of the Q2 2026 Conference Call with just such a question. Specifically, Ms. Thibault asked if the "single customer" at issue was "the same customer" that had been mentioned in a

---

[39] *See* Marie Thibault, *Management Meetings Focus on What's Next As EMBC Advances Its Pipeline and Looks to Evolve Beyond Diabetes,* BTIG at 1 (Sept. 19, 2025).

prior quarter's conference call[40] to whom Embecta had made "pricing concessions" in an effort to stabilize Embecta's volumes with that customer:

> Q - Marie Thibault
>
> Good morning. I want to spend a little time better understanding the U.S. weakness this quarter and assumptions going forward. **I think you said in your commentary that in the U.S. pen needle segment, the losses were concentrated at a single customer. I wanted to understand if that was the same customer as was referenced last quarter, where there were pricing concessions made, and why, if so, the volumes were not stabilized by that move.** And then secondly, you called out a weakness in insulin pen prescriptions. Can you tell us a little bit more about what's driving that? Could that be short-lived, or is that a long-term trend?

Q2 2026 Conference Call, Bloomberg Tr. at 8.

190. In his response to Ms. Thibault's question, Kurdikar admitted that the "single customer" with whom Embecta had suffered material share loss (*i.e.*, Walgreens) was indeed "the same customer that we had referred to earlier" in the Q4 2025 Conference Call (*i.e.*, the customer to whom Embecta had made "pricing concessions" during the fourth quarter of fiscal 2025 so as to "stabilize[]" product "volumes"):

---

[40] Although Ms. Thibault's question indicated that the discussion of pricing concessions to a large, single customer had occurred in the "last quarter" conference call (*i.e.*, the Q1 2026 Conference Call held on February 5, 2026), review of the transcript of the Q1 2026 Conference Call makes clear that there was no such or similar discussion during that call. There was, however, such a discussion in the immediately preceding conference call – *i.e.*, the Q4 2025 Conference Call, held on November 25, 2025. It appears likely – indeed, certain – that Ms. Thibault was actually referring to the Q4 2025 Conference Call discussion.

> A - Devdatt Kurdikar
>
> Marie, good morning. Let me start by taking the market question first on insulin pens and pen needles, and then go to the competitive loss question. So first, on insulin pens . . .
>
> ***
>
> **Now with respect to the competitive loss, yes it was the same customer that we had referred to earlier**. Obviously, I don't want to talk about pricing at any specific customer or even broadly in the U.S. market but I think what we've ended up is the share loss at that customer is a little bit deeper than we anticipated . . .

*Id*. at 8-9.

191. Thus, in admitting that Ms. Thibault had correctly linked the "single customer" referenced in Defendants' May 5, 2026 disclosures (*i.e.*, Walgreens) to the customer referenced in Defendants' November 25, 2025 disclosures (which Kurdikar described in the Q4 2025 Conference Call as "a large U.S. pharmacy customer"), Kurdikar further conceded that Embecta had made those "pricing concessions" during Q4 2025 (*i.e.*, the three month period ended September 30, 2025), in an effort to stabilize the volume of Embecta products sold to/through Walgreens.

192. Therefore, Kurdikar admitted that Defendants, even prior to the start of the Class Period (specifically, between July and September 2025), **had been aware that Embecta was losing share at Walgreens**, given that Embecta had taken affirmative actions no later than September 2025, such as extending pricing concessions to Walgreens, in an effort to stabilize Embecta's share at Walgreens.

### C. Defendants' *Scienter* Can Be Inferred Because Pen Needles and Walgreens Sales Constituted Embecta's Core Operations

193. Pen needles were Embecta's most important product, accounting for 73% of the Company's reported revenues. *See* ¶ 36(A), *supra*. Walgreens was one of Embecta's largest customers. *See* ¶¶ 70-76, *supra*. As set forth in Sections VI.A and VI.B above, Defendants personally tracked that business.

194. Walgreens' move from Traditional to Transparent Pricing was publicly known during the Class Period. *See* ¶¶ 84–85, *supra.* HTL-Strefa announced in October 2024 that Droplet was the fastest-growing pen needle brand in North America. California's Medicaid program listed HTL-Strefa's Droplet at approximately 30% below Embecta's price effective July 1, 2025. And by January 7, 2026, Walgreens pharmacy staff were discussing on a public message board the mid-December 2025 directive designating HTL-Strefa's Droplet as Walgreens' "Preferred Brand." *See* ¶¶ 97–98, n.26, *supra*. Under these circumstances, it is implausible that Defendants were unaware, in late 2025 or at the very latest early 2026, that Walgreens had officially designated HTL-Strefa's Droplet as its preferred pen needle, replacing Embecta, and instructed its stores accordingly. Even if the investing public would not have been looking for this information (Embecta did not publicly name Walgreens, HTL-Strefa or Droplet during the Class Period), the executives responsible for Embecta's largest product and one of its largest customers must have found it, if Walgreens did not tell them directly.

## VII. LOSS CAUSATION

195. During the Class Period, Defendants made materially false and/or misleading statements regarding critically important aspects of Embecta's operations, including the performance, prospects, and risks of its core injection business, and the continuing viability of Embecta's 2026 Guidance, Strategic Plan, and dividend.

196. Consequently, throughout the Class Period, Embecta shares traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other Class members purchased Embecta shares relying on the integrity of the market price for Embecta's common stock and information available to the market relating to Embecta's core injection business, prospects, and risks, as well as Embecta's 2026 Guidance, Strategic Plan, and dividend.

197. Defendants' Class Period misrepresentations became apparent to the market through Defendants' post-Class Period, May 5, 2026 disclosures, which first revealed Embecta's cratering share at Walgreens simultaneously with its associated downstream consequences, including invalidating the 2026 Guidance, undermining the Strategic Plan, and effectively eliminating Embecta's dividend.

198. When disclosure of these truths corrected Defendants' prior misrepresentations, Embecta's share price immediately and sharply declined as the previously prevailing artificial inflation was removed from the market price of Embecta's shares. Specifically, on May 5, 2026, as more than 16.1 million Embecta shares traded hands (nearly 20 times the average daily trading volume during the Class Period), Embecta shares fell from $9.25 per share (at which they had closed trading on May 4, 2026) to close trading on May 5, 2026 at $3.90 per share – a one-day decline of $5.35 per share, or 57.8%.

199. Embecta's May 5, 2026 share price declines cannot be ascribed to general stock market or healthcare industry factors, as Embecta's share price moved in a direction **opposite** to that of the stock market generally and healthcare stocks specifically. On the same day and by contrast, the broader stock market rose substantially (with the Russell 2000 index up 1.75%), and the healthcare sector remained effectively flat (with the Russell 2000 Healthcare index up 0.06%).

200. Embecta's share price decline was a direct and foreseeable consequence of the disclosure of the true state of Embecta's affairs, which Defendants had previously concealed.

201. As a result of their Class Period purchases of Embecta shares, at prices inflated by Defendants' Class Period misrepresentations of Embecta's business, Plaintiffs and other Class members suffered economic loss – *i.e.*, damages – under

the federal securities laws. Accordingly, Defendants' wrongful conduct directly and proximately caused these losses and damages, which this action seeks to recover.

## VIII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

202. To the extent that Plaintiffs allege that Defendants made affirmative misstatements, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

A. Defendants made public misrepresentations or statements that became inaccurate or misleading by failing to disclose material facts during the Class Period;

B. The omissions and misrepresentations were material;

C. Embecta's common stock traded in an efficient market;

D. The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Embecta common stock;

E. Plaintiffs and other members of the Class purchased Embecta common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

F. Embecta's common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market, with average daily trading volume during the Class Period exceeding 800,000 shares per day;

G. As a regulated issuer, Embecta filed periodic public reports with the SEC and NASDAQ;

H. Embecta regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

I. Embecta was followed by securities analysts employed by major brokerage firms and banks – including BTIG LLC; Wolfe Research, LLC; JPMorgan Chase & Co.; and Mizuho Securities (USA) LLC – who wrote reports distributed to those firms' sales forces and certain customers and that were publicly available and entered the public marketplace; and

J. The price of Embecta common stock reacted promptly to the dissemination of new information regarding Embecta, which was

quickly reflected in and incorporated into the Company's stock price throughout the Class Period and at all relevant times.

203. As a result of the foregoing, the market for Embecta common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Embecta's shares. Under these circumstances, all purchasers of Embecta common stock during the Class Period suffered similar injuries through their purchases at artificially inflated prices, and thus the presumption of reliance applies.

204. A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), to the extent the claims asserted herein against Defendants are predicated upon omissions of material facts for which there is a duty to disclose. Because this action involves Defendants' decision to withhold disclosure of materializing risk of material share loss at one of Embecta's largest customers, Walgreens – and thus, of materializing danger to both the 2026 Guidance and the Strategic Plan – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that a reasonable investor might consider the facts withheld important in making investment decisions.

## IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

205. The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine," applicable to forward-looking statements under certain circumstances, do not apply to any of the materially false or misleading statements alleged herein.

206. Statements complained of herein were not forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time each statement was made and/or statements that omitted material current or historical facts necessary to make the statements made not misleading.

207. To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

208. To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As alleged above in detail, given the then-existing facts

contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

209. To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading statement because at the time such statement was made, the speaker knew the statement was false or misleading, did not actually believe the statement, had no reasonable basis for making the statement, or the statement was authorized and approved by an executive officer of Embecta who knew that such statement was false or misleading.

## X. CLASS ACTION ALLEGATIONS

210. Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class: all persons and entities who purchased or otherwise acquired the publicly traded common stock of Embecta during the period between November 25, 2025 and May 4, 2026, inclusive, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of the Company at all relevant times; (iv) any firm, trust, corporation, or other entity in which any

Defendant has or had a controlling interest; and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

211. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, Embecta stock was actively traded on the NASDAQ (an open and efficient market) under the symbol "EMBC," where average daily trading exceeded 800,000 shares per day. Thus, millions of shares of Embecta common stock were traded publicly on the NASDAQ during the Class Period. As of April 28, 2026, Embecta had 59,327,677 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Embecta or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

212. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws alleged herein. Plaintiffs have no interests antagonistic to those of the Class.

213. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

214. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

A. whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

B. whether Defendants participated in and pursued the common course of conduct complained of herein;

C. whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the Company's business, operations, and prospects;

D. to what extent the members of the Class have sustained damages, and the proper measure of such damages.

215. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it

impossible for members of the Class to individually redress the wrongs done to them. Plaintiffs know of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

## XI. CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

### Against All Defendants

216. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

217. This Count is brought against all Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Plaintiffs and all other Class members.

218. During the Class Period, Defendants, while in possession of material adverse, non-public information, disseminated or approved the false and/or misleading statements and omissions alleged herein, which each Defendant knew or recklessly disregarded were false or misleading in that they misrepresented material facts and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public,

including Plaintiffs and other Class members, as alleged herein; (ii) cause the price of Embecta common stock to be artificially inflated and/or maintain artificial inflation in the price of Embecta common stock; and (iii) cause Plaintiffs and other members of the Class to purchase Embecta common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein while using the means and instrumentalities of interstate commerce and the facilities of a national securities exchange.

219. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they, individually and in concert, directly and indirectly, knowingly and/or recklessly: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs and other members of the Class in connection with their purchases of the Company's common stock, in an effort to maintain artificially high market prices for Embecta's shares during the Class Period in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As alleged herein, the material misrepresentations contained in, and the material facts omitted from, Defendants' public statements included, but were not limited to, the materially false and/or misleading statements

and omissions alleged in Section V. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

220. Defendants are liable for all materially false and/or misleading statements and omissions of material facts alleged above in Section V. By virtue of their high-level positions at the Company during the Class Period, the Individual Defendants were authorized to make public statements and made public statements during the Class Period on Embecta's behalf. The Individual Defendants were privy to and participated in the creation, development, and issuance of the materially false or misleading statements alleged herein, and they and the Company disseminated information to the investing public that they either knew, or were reckless in not knowing, was materially false or misleading. Embecta is liable for the false and/or misleading statements of the Individual Defendants, who made those statements within the scope of their authority and on the Company's behalf.

221. In addition to the duties of full disclosure imposed on Defendants as a result of making affirmative statements and reports to the investing public, Defendants also had a duty to disclose information required to update and/or correct their prior statements, misstatements, and/or omissions, and to update any statements or omissions that had become false or misleading as a result of intervening events. Further, Defendants had a duty to promptly disseminate truthful information that

would be material to investors in compliance with the integrated disclosure provisions of the SEC, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information.

222. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and without a reasonable basis, for the purpose and effect of concealing from the investing public the relevant truth and misstating the intrinsic value of Embecta's common stock. By concealing material facts from investors, Defendants maintained artificially inflated prices for Embecta's common stock throughout the Class Period.

223. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Embecta common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which Embecta's shares traded, and/or in the absence of material adverse information that

was known to or recklessly disregarded by Defendants, but not disclosed in public statements by them during the Class Period, Plaintiffs and the other members of the Class acquired Embecta common stock during the Class Period at artificially high prices and were damaged thereby.

224. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Embecta was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Embecta shares, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

225. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

226. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act

### Against the Individual Defendants

227. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

228. This Count is brought by Plaintiffs, on behalf of the Class, against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

229. During the Class Period, each of the Individual Defendants was a controlling person of Embecta within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the materially false and/or misleading statements and omissions of material facts in statements filed by the Company with the SEC and/or disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company and its executives, including the content and dissemination of the various statements that Plaintiffs

contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

230. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

231. Each of the Individual Defendants was a direct participant in making, and/or made aware of the circumstances surrounding, the materially false and/or misleading statements and omissions during the Class Period, as alleged in Section V, and acted with scienter as alleged in Section VI. Accordingly, each Individual Defendant was a culpable participant in the underlying violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged herein.

232. As set forth above, Embecta and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons of Embecta, each of the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Embecta is liable under Section

10(b) of the Exchange Act and Rule 10b-5, to Plaintiffs and the other members of the Class.

233. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants, as follows:

(a) Determining that this action is a proper class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying the Class as defined herein, and certifying Plaintiffs as Class representatives and their counsel as Class Counsel;

(b) Declaring and determining that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, and that the Individual Defendants violated Section 20(a) of the Exchange Act, by reason of the acts and omissions alleged herein;

(c) Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with prejudgment and post-judgment interest thereon;

(d) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(e) Awarding such other and further relief as the Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 23, 2026

Respectfully submitted,

**KIRBY McINERNEY LLP**

*/s/ Karina Kosharskyy*
Karina Kosharskyy
Andrew M. McNeela
Ira M. Press
Lauren K. Molinaro
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
Email: kkosharskyy@kmllp.com
amcneela@kmllp.com
ipress@kmllp.com
lmolinaro@kmllp.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

Adam M. Apton
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Email: aapton@zlk.com

*Additional Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2026, a true and correct copy of the foregoing Amended Complaint was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Dated: October 23, 2026

*/s/ Karina Kosharskyy*
Karina Kosharskyy
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
Email: kkosharskyy@kmllp.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*